■ Sebastian Holdings, Inc., Appellant-Respondent, v Deutsche Bank AG., Respondent-Appellant. [912 NYS2d 13]—

Order, Supreme Court, New York County (Barbara R. Kapnick, J.), entered December 14, 2009, which denied plaintiff's motion to enjoin a related commercial action before Queen's Bench in London, granted defendant's motion to dismiss the instant causes of action for breach of fiduciary duty, fraudulent concealment, fraud and negligent misrepresentation, denied the motion with respect to causes of action for conversion, unjust enrichment and money had and received, and denied dismissal of the complaint on grounds of forum non conveniens, affirmed, with costs.

On its motion for preliminary injunctive relief, plaintiff claimed that the London action was brought solely to deprive it of a right to a jury trial, prevent it from taking depositions, and avoid punitive damages, all assertedly unavailable in the English courts. These conclusory allegations failed to establish

that the London action was brought in bad faith, for the purpose of evading New York law, or motivated by fraud or an intent to harass (*Sarepa, S.A. v Pepsico, Inc.*, 225 AD2d 604 [1996]).

Plaintiff sued herein for breach of an agreement that provides for disputes to be brought in the New York courts, and the claim for breach thereof seeks damages far in excess of the $1 million threshold set forth in General Obligations Law § 5-1402. Under the circumstances, the parties' choice of forum must be honored, and precludes a challenge on the basis of forum non conveniens as a matter of law (*see* CPLR 327 [b]). Defendant's argument that England is a more convenient forum is in any event unpersuasive, since the relevant factors do not favor England over New York (*see Islamic Republic of Iran v Pahlavi*, 62 NY2d 474, 479 [1984], *cert denied* 469 US 1108 [1985]).

Turning to the individual causes of action, we agree with the motion court that the lack of a fiduciary relationship between the parties is fatal to plaintiff's claims for breach of fiduciary duty (*Bailey v Gray, Seifert & Co.*, 300 AD2d 258 [2002]; *see Kurtzman v Bergstol*, 40 AD3d 588, 590 [2007]), fraudulent concealment (*Blake v Ford Motor Co.*, 41 AD3d 150 [2007]) and negligent misrepresentation (*J.A.O. Acquisition Corp. v Stavitsky*, 8 NY3d 144, 148 [2007]). Plaintiff's alleged reliance on defendant's superior knowledge and expertise in connection with its foreign exchange trading account ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities that do not give rise to fiduciary duties (*Dembeck v 220 Cent. Park S., LLC*, 33 AD3d 491, 492 [2006]; *cf. EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19-20 [2005]).

The claim for fraud essentially alleges that defendant failed to monitor and report to plaintiff the extent of its trading exposure, which were duties required under their agreement. The fraud claim cannot be sustained because it is duplicative of the cause of action for breach of contract (*see Ross v DeLorenzo*, 28 AD3d 631, 636 [2006]).

By contrast, the conversion claim does state a cause of action. Plaintiff alleges it held assets in certain accounts at defendant's branches in London and Geneva, to which it had exclusive title and a right to immediate possession upon demand, and that defendant wrongfully, improperly and in an unauthorized manner intentionally liquidated those accounts and transferred the funds to itself (*see Republic of Haiti v Duvalier*, 211 AD2d 379, 384 [1995]). This is not a mere restatement of the claims for breach of contract, as plaintiff has not alleged any breach of agreement that directly relates to the allegedly converted funds,

and thus the conversion claim stands on its own (*see e.g. Hamlet at Willow Cr. Dev. Co., LLC v Northeast Land Dev. Corp.*, 64 AD3d 85, 112-115 [2009], *lv dismissed* 13 NY3d 900 [2009]).

As with the conversion claim, the claim for unjust enrichment does not depend on the existence of valid and enforceable written contracts between the parties, but rather arises from facts wholly independent of any contract upon which plaintiff sues. Therefore, it cannot be said at this early stage of the proceeding that these claims are duplicative of the breach-of-contract claims, and the rule of *Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.* (70 NY2d 382, 389 [1987]) does not apply.

We have considered the parties' remaining contentions and find them unavailing. Concur—Andrias, J.P., Friedman, McGuire and Román, JJ.

Catterson, J., concurs in part and dissents in part in a memorandum as follows: "The best defense is a good offense."[1]

I must respectfully dissent because I would reinstate the plaintiff's cause of action for fraud. Moreover, notwithstanding the recent judgment of the English Court of Appeal determining that Deutsche Bank is entitled to pursue its claim in the English courts as to monies allegedly owed by Sebastian Holdings, I would enjoin the defendant from proceeding with its London action.

The English judgment, which also declined to stay the English proceedings, does not alter the following undisputed facts: that the alleged debts owed by Sebastian Holdings (hereinafter referred to as SHI) were accrued solely in connection with a foreign exchange trading account established in New York pursuant to an agreement that provided for New York choice of law and the jurisdiction of New York courts; that two separate agreements (among the numerous agreements signed by the two parties) allow Deutsche Bank (hereinafter referred to as DB) to pursue claims in the English courts for certain debts owed under those two agreements; that DB relies on the offset provision in one of the agreements to assert that the alleged New York debt is now a debt owed under the English jurisdiction agreements.[2] However, SHI disputes that it owes any monies to DB. On the contrary, it alleges damages arising from DB's breach of the

---

**1.** This ubiquitous sports and military cliche is variously attributed to a misquotation of both Carl von Clausewitz and Sun Tzu's maxim of "attack is the best defense," as well as to Vince Lombardi, Mao Tse Tung and Jack Dempsey.

**2.** The English court's judgment appears to be based on the premise that in agreeing to different jurisdiction clauses, SHI has agreed to litigate a New York contract dispute in England just because an offset provision in an En-

New York contract, and was the first to commence litigation as to who owes whom. Hence, in my opinion, any court action must first determine that issue, which is squarely before the New York Supreme Court, and should therefore be resolved by it.

Moreover, the doctrine of comity, which suggests that recognition be given to the judicial acts of another nation, nevertheless, as set forth below in greater detail, acknowledges that it does not require the courts to abandon their obligation to "persons protected under its laws." In this case, where the litigation indisputably arises out of a contract providing for New York choice of law and the jurisdiction of New York courts, SHI, which seeks to enforce that bargained-for right, should not be abandoned for the sake of conforming to the somewhat amorphous concept of "international duty."

In this action, SHI, a Turks and Caicos corporation that holds investments, deals in securities and currencies trading, and engages in other financial endeavors is wholly owned and controlled by Norwegian billionaire investor, Alexander Vik. The defendant, DB, is a German corporation with offices and branches in the United States, including in New York. DB provides financial, management, and business services around the globe.

According to SHI's complaint, the corporation became a customer of DB in 2004. Between May 2006 and January 2008, DB and SHI entered into a number of agreements concerning equities trading. These agreements (hereinafter referred to as the equities agreements) call for the application of English law and contain forum selection clauses in favor of English courts.

Also in 2006, SHI decided to retain Klaus Said as an independent contractor to manage a limited amount of capital for the purpose of engaging in foreign exchange trading on SHI's behalf. To this end, in or about November 2006, SHI opened a foreign exchange prime brokerage account with DB in New York (hereinafter referred to as the NYFXPB account). The NYFXPB account was to be used exclusively for Said's foreign exchange trading, and SHI was to allocate a certain sum from a previously established account in Geneva to support such trading by Said.

In connection with the opening of the account, the parties entered into an NYFXPB agreement drafted by DB. The agreement mandates that it will be "governed by" and "construed in

___

glish jurisdiction agreement allows DB to claim that the debt arises out of that agreement.

accordance with" the law of New York, and that "[a]ny action or proceeding relating in any way to this Agreement may be brought and enforced in the courts" of New York.

SHI alleges that the NYFXPB account required specialized "prime brokerage" services, which would draw upon DB's "superior knowledge and expertise," and which included, specifically, providing SHI with daily and at times twice-daily calculations and reporting of positions, exposure, valuations, and the like, as well as typical "back office" services. The purpose of these specialized services was, inter alia, to monitor the risks in such account. SHI alleges that DB's reporting obligation was crucial to it so that it could ensure that its collateral limitation, or its exposure, would not exceed $35 million.

DB agreed to set the collateral requirement at 200% of the "value at risk" or "VaR," meaning that SHI would be required to pledge as collateral two times the calculated value at risk of its foreign exchange trades. The NYFXPB agreement dated November 3, 2006, and the pledge and pledgeholder agreement, dated November 28, 2006 (hereinafter referred to as the pledge agreement) memorialized these terms.

SHI further alleges that the parties reached an oral understanding that SHI's maximum exposure in connection with its foreign exchange trading in the NYFXPB account would be limited to $35 million. SHI alleges that this agreement was referred to by the parties as the collateral limitation agreement (hereinafter referred to as the CLA). DB denies the existence of any such agreement.

In addition to the above-described agreements, SHI and DB also entered into an ISDA master agreement, schedule, and credit support annex, dated November 22, 2008 (hereinafter referred to as the FX ISDA master agreement), which related to the foreign exchange transactions and attendant liabilities.

According to DB, the FX ISDA master agreement provides for the netting and settlement of all covered foreign exchange transactions, sets forth agreement-termination procedures, and outlines extension of credit, including the calculation of VaR, the credit support amounts, and demands for additional collateral. In contrast to the NYFXPB agreement, the FX ISDA master agreement is governed by English law, and the parties agreed to submit to the jurisdiction of the English courts for the resolution of all disputes relating to it.

In 2007, Said engaged in certain structured transactions in addition to the standard foreign exchange transactions. DB approved these structured transactions, but never requested that SHI pledge additional collateral above and beyond the original

$35 million. During most of 2008, a substantial number of these structured transactions were done by Said in the NYFXPB account, and each was approved by DB.

At a hearing before the motion court, counsel for DB summarized the situation thus: "[SHI] engaged in these foreign exchange transactions for a time. They made money and then there came a time when they didn't."

What happened subsequently led to the dispute at the heart of this action. SHI alleges that on the morning of October 6, 2008, DB's Web site stated that the net equity in the NYFXPB account was $27,001,056, but in reality, the account had accumulated losses amounting to hundreds of millions of dollars. Then, according to the complaint, between October 14, 2008 and October 21, 2008, DB made four wrongful margin calls, demanding that SHI increase the collateral held against the mounting risk in the NYFXPB account. SHI alleges that, relying on erroneous information and under duress, it paid the margin calls by transferring up to $436 million from equities accounts. But then, SHI refused to pay one of the margin calls and asked for documentation on the claimed losses.

SHI alleges that DB then threatened that if SHI did not make payments on the margin calls, other assets of SHI on deposit with DB would be taken by DB, and that DB would insist on liquidating profitable trades and positions held by SHI at the risk of significant loss to SHI to satisfy the outstanding margin calls.

By letter dated October 23, 2008, DB claimed that SHI was in default of the equities agreement and owed it upwards of two billion in Norwegian currency. The next day, DB wrote to Said purporting to terminate the NYFXPB agreement. DB then blocked SHI's online access to the NYFXPB account. SHI alleges that, throughout October and November 2008, DB repeatedly promised to give SHI the accurate reports and documentation regarding the NYFXPB account but failed to do so. By letter dated December 4, 2008, DB demanded $120 million in respect of the NYFXPB account.

In light of these events, SHI timely commenced an action against DB in New York County Supreme Court by filing a summons with notice on or about November 24, 2008. SHI alleged that DB essentially increased SHI's line of credit without first notifying SHI or obtaining its consent to do so, allowed SHI to unwittingly borrow against this increased credit line by failing to supply SHI with the required daily or twice-daily calculations of VaR, and then forced SHI to pay on margin calls in amounts that SHI is not even sure are correct. Finally, DB improperly

took the funds to satisfy the margin calls from SHI accounts with DB that were completely unrelated to the NYFXPB account, including forcing liquidations of positions at a substantial loss, without SHI's consent.

The procedural narrative unfolded as follows:

On December 4, 2008, DB demanded a complaint in the New York action.

On or about January 20, 2009, SHI served DB with the complaint. SHI asserted 10 causes of action, alleging, inter alia, breach of the NYFXPB agreement, breach of the CLA, breach of fiduciary duty, conversion, unjust enrichment, and fraud.

On January 21, 2009, DB commenced an action in the High Court of Justice, Queen's Bench Division, Commercial Court (hereinafter referred to as the London action) alleging breach of certain equities agreements by SHI in the failure to pay approximately $250 million that DB contends is due and owing after margin calls on, and the liquidation of, SHI's New York and London accounts. The two actions then proceeded as follows:

On or about February 23, 2009, SHI moved in the New York action for a temporary restraining order and preliminary injunction enjoining DB from proceeding in the action that DB commenced in London.

On February 24, 2009, DB cross-moved in New York for, inter alia, dismissal on the grounds of forum non conveniens or for a stay. DB opposed SHI's motion for a preliminary injunction.

In London, on April 2, 2009, DB filed the particulars of claim.

On April 6, 2009, SHI appeared in the London action and challenged the jurisdiction of the English court. SHI also made an application for a stay.

On August 14, 2009, the High Court ruled that it has jurisdiction.

On October 15, 2009, the English Court of Appeal rejected SHI's application for permission to appeal the High Court ruling.

On December 1, 2009, the High Court dismissed SHI's stay application.

On December 3, 2009, the English Court of Appeal reversed itself, granted SHI's application to appeal the jurisdiction ruling of August 14, and stayed the action pending appeal.

In New York, on December 14, 2009, the motion court denied DB's cross motion to dismiss on the basis of forum non conveniens; denied DB's request for a stay; denied SHI's motion for a preliminary injunction; and granted DB's motion to dismiss

those claims based on an alleged fiduciary relationship between the parties. The court recognized that simultaneous litigation of the two actions could lead to inconsistent results. However, the motion court also acknowledged that, pursuant to the doctrine of comity, the mere additional expense and trouble of litigating in a foreign court did not justify the issuance of an injunction enjoining the London action. Moreover, because the Court of Appeal in the London action had already voluntarily stayed that action pending the appeal of the High Court's prior ruling that it has jurisdiction over DB's claims against SHI, the motion court decided that the proper course would be to permit the New York action to proceed, and wait and see how the various English courts ultimately ruled on the issue of jurisdiction.

On August 20, 2010, the English Court of Appeal, Civil Division, rendered its judgment as detailed above.

Although I concur with the majority in part, for the reasons set forth below, I believe the motion court improvidently exercised its discretion in denying an injunction enjoining the prosecution of DB's London action. I also believe the court erred in dismissing the cause of action for fraud.

It is well settled that, because of the doctrine of comity, "[t]he use of the injunctive power to prohibit a person from resorting to a foreign court is a power rarely and sparingly employed." (*Arpels v Arpels*, 8 NY2d 339, 341 [1960].) However, such injunctive power may be exercised where the party who seeks to enjoin a proceeding of a sister state or foreign court of competent jurisdiction clearly demonstrates that "the suit sought to be enjoined was brought in bad faith, motivated by fraud or an intent to harass the party seeking an injunction, or [that] its purpose was to evade the law of the domicile of the parties." (*Chayes v Chayes*, 180 AD2d 566, 566-567 [1st Dept 1992] [internal quotation marks and citation omitted]; *see Sarepa, S.A. v Pepsico, Inc.*, 225 AD2d 604 [2d Dept 1996].)[3]

The doctrine of comity has generally proved to be a substantial obstacle in enjoining foreign proceedings, but in this case, it need not be an insurmountable one. Comity is "neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition

---

**3.** Case law on injunctions aimed at foreign proceedings, as sparse as it is, indicates that the traditional standards—irreparable harm, likelihood of success on the merits, and balance of equities—for granting a preliminary injunction directed at parties' actions outside the courthouse rather than the procedure itself are not applicable in an injunction aimed solely at aiding the jurisdiction of the court. Hence, no analysis based on those standards is undertaken here.

which one nation allows within its territory to the . . . judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of *other persons who are under the protection of its laws.*" (*Hilton v Guyot*, 159 US 113, 163-164 [1895] [emphasis added].) The recent English judgment is ostensibly a judicial act that requires recognition, but, in essence, the English court's pronouncement that DB is entitled to pursue its claim in England is more equivocal than determining that DB is obliged to pursue its claims in England. Moreover, it is evident that the doctrine of comity does not override all other concerns, and this Court is clearly required to balance "international duty" against its obligation to protect the rights of "persons . . . under the protection of its laws." (*Id.*)

In the instant case, in my opinion, the latter obligation outweighs the former duty. SHI entered into a contract that provided for New York choice of law and the jurisdiction of New York courts. The instant dispute between the parties arises solely out of that contract; the allegations of monies owed or damages accrued arise solely out of that contract.

Moreover, it appears evident on its face that the London action was commenced by DB to evade SHI's choice of a New York forum. First, it was commenced more than six weeks after SHI filed a summons and notice in New York County Supreme Court, and just one day after SHI filed the complaint demanded by DB in the New York action. However, DB's London claim, as evidenced from the particulars, could equally well have been filed as a counterclaim in the New York action.

DB's assertion that the NYFXPB agreement is "but one, relatively minor piece of the parties' dispute," and that "the subject matter of the dispute is governed by written agreements with forum selection clauses in favor of jurisdiction in England" is an intransigently argued, nevertheless incorrectly held, position. In a nutshell, DB asserts that the dispute concerns the accounts from which and the agreements pursuant to which DB may recover monies owed by SHI when, in fact, SHI disputes that it owes any monies to DB at all; that any losses of SHI were accrued by DB's wrongful conduct.

The summons and notice filed in New York clearly stated that the action arises out of "defendant's wrongful conduct relating to the [NYFXPB] agreement . . . including without limitation defendant's breaches of its reporting obligations and the parties' agreement as to pledged assets for trading activities in such account, which wrongful conduct resulted in wrongful and improper margin calls of plaintiff by defendant and the wrong-

ful and improper liquidation and taking by defendant of assets in other accounts of plaintiff."

Further, the CPLR 306-b notice included the information that SHI sought, inter alia, relief in the form of compensatory damages in the amount of $425 million for repayment of wrongful and improper margin calls; an accounting of the losses in SHI's accounts; and for punitive damages. The complaint filed on January 20, 2009 listed 10 causes of action including breach of the agreement, breach of fiduciary duty, conversion and fraud.

In my view, the London action filed by DB under the guise of alleging a breach of contract by SHI is merely a counterclaim existing solely by virtue of the claims asserted by SHI in the New York Supreme Court complaint. Plainly any claim DB asserted in London could have been filed as a counterclaim in the New York action.

DB's assertion, articulated most recently before this Court, that the action commenced in London for monies due of $250 million is based on the FX ISDA master agreement and equities agreements that specify English law and the jurisdiction of the English courts, and so could not be brought in New York, is refuted by the record. The language in the FX ISDA master agreement and the equities agreements governing the equities accounts from which funds were transferred by DB provides that, "[n]othing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction." Moreover, the English High Court, based on that very language, has already specifically rejected the contention that DB's action could not be brought in New York, or that it must be brought in London. The English Court of Appeal goes no further than to determine that DB is entitled to bring an action to recover the claimed debts in the English courts.

It would be an ironic result if we allow DB to compel SHI to participate in parallel litigation because agreements governing certain accounts fall under nonexclusive forum selection clauses, when the gravamen of SHI's complaint is that DB helped itself unlawfully to funds in those accounts.

The agreements that DB relies on to assert the jurisdiction of the English courts have nothing to do with the issues framed, that is, whether SHI owes or ever owed the monies claimed by DB. SHI's claim that it owes DB nothing implicates only the NYFXPB agreement. If SHI is able to establish that DB breached the NYFXPB agreement, and that there was, in fact, a CLA in existence which limited SHI's exposure to $35 million, then there would be no reason to examine the contracts or agreements relied upon by DB as a predicate for the application

of English law or selection of London as a forum. Conversely, any litigation that establishes the validity of agreements allowing for the transfer of funds from SHI's equities accounts to the NYFXPB account would nevertheless not resolve the issue of whether the transfer was valid.

As SHI asserted at oral argument before the motion court, "the only logical thing . . . is for th[e] [New York] court to first determine if [SHI] is right. If these losses were occasioned and caused by [DB's] wrongdoing . . . [DB's] action in London will go away on its own weight. The converse won't happen."

DB's attempt to evade a New York forum is further evident in its filing of a cross motion to dismiss the New York action on the ground of forum non conveniens. In the first place, the NYFXPB agreement with the New York forum selection clause was drafted by DB. Moreover, as the motion court correctly held, pursuant to CPLR 327 (b) and General Obligations Law § 5-1402, "where a party has consented to the court's jurisdiction prior to litigation," as DB did in the NYFXPB agreement, "that party may not, as a matter of law, subsequently seek dismissal of the action on the ground of inconvenient forum." (*See Sterling Natl. Bank v Eastern Shipping Worldwide, Inc.*, 35 AD3d 222, 223 [1st Dept 2006]; *see also National Union Fire Ins. Co. of Pittsburgh, Pa. v Worley*, 257 AD2d 228, 232 [1st Dept 1999]; *Arthur Young & Co. v Leong*, 53 AD2d 515, 516 [1st Dept 1976], *appeal dismissed* 40 NY2d 984 [1976].)

It is also uncontested that New York is the location where SHI opened the NYFXPB account with DB; that every trade took place in New York or New Jersey; that Klaus Said is domiciled in Greenwich, Connecticut; that every trader with whom Said dealt was in New York or New Jersey; that the two affidavits of fact submitted by DB were so submitted by DB's risk manager and DB's global FX trading head, both located in New York.

Lastly, as SHI contends, when DB commenced the London action, it was "fully aware" that prosecuting the action in English courts would be prejudicial to SHI. SHI would be entitled to significantly less pretrial discovery; there would be no depositions of the persons involved in the alleged wrongdoing; and there would be minimal documentary disclosure. SHI would not be entitled to a jury trial, nor could it seek punitive damages.

I would also deny DB's CPLR 3211 (a) (7) motion and reinstate the cause of action for fraud. In my opinion, in granting dismissal of this cause of action, the motion court made improper findings of fact. At this stage of the pleadings, the allegations must be accepted as true. In my opinion, the cause of

action for fraud was sufficiently and specifically pleaded in SHI's complaint, wherein SHI alleged that DB withheld the truth about the losses in the NYFXPB account, instead advising SHI that the value of the pledged account was in excess of $67 million.

