**FEDERAL HOUSING FINANCE AGENCY, etc., Plaintiff,**

v.

**UBS AMERICAS, INC., et al., Defendants.**

**No. 11 Civ. 5201 (DLC).**

United States District Court, S.D. New York.

May 4, 2012.

Order Granting Motion to Certify Appeal June 19, 2012.

Philippe Z. Selendy, Kathleen M. Sullivan, Adam M. Abensohn, Manisha M. Sheth, Jordan A. Goldstein, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, for the plaintiff.

Jay B. Kasner, Scott D. Musoff, Robert A. Fumerton, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for defendants.

## OPINION & ORDER

DENISE COTE, District Judge:

This is one of seventeen actions brought by the Federal Housing Finance Agency ("FHFA" or "the Agency"), as conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, the "Government Sponsored Enterprises" or "GSEs"),

against various financial institutions involved in the packaging, marketing and sale of residential mortgage-backed securities that the GSEs purchased in the period from 2005 to 2007. Fifteen of the actions filed in New York courts—both state and federal—are currently concentrated before this Court for coordinated pretrial proceedings.[1]

FHFA brought this case against USB Americas, Inc. ("UBS Americas") and various affiliated entities and individuals[2] on July 27, 2011. The Agency's Second Amended Complaint ("SAC"), filed on December 21, 2011, asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, $l$ (a)(2), $o$; the Virginia Securities Act, VA Code Ann. § 13.1–522(A)(ii), (C); the District of Columbia Securities Act, D.C.Code § 31–5606.05(a)(1)(B), (c); and the common law tort of negligent misrepresentation. On January 20, 2012, defendants filed a motion to dismiss the SAC. The motion was fully submitted on February 24. For the reasons that follow, the motion is granted in part.

## BACKGROUND

On July 30, 2008, in the midst of a housing crisis, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"). *See* Pub.L. No. 110–289, 122 Stat. 2654 (2008). As part of the Act, Congress established FHFA as the regulator of Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. *See id.* § 1101. HERA included a provision authorizing the Director of FHFA to place the GSEs into conservatorship under the Agency's authority "for the purpose of reorganizing, rehabilitating, or winding up [their] affairs." *Id.* § 1367(a)(3). On September 6, 2008, FHFA Director James B. Lockhart III invoked this authority and appointed the Agency as conservator of both GSEs, giving FHFA the right to assert legal claims on their behalf.

The SAC can be briefly summarized. Plaintiff contends that Fannie Mae and Freddie Mac purchased over $6.4 billion in residential mortgage-backed securities ("RMBS") sponsored or underwritten by UBS entities during the period between September 2005 and August 2007. RMBS are securities entitling the holder to income payments from pools of residential mortgage loans that are held by a trust. For each of the securities at issue here, the offering process began with a "sponsor," which acquired or originated the mortgage loans that were to be included in the offering.[3] The sponsor transferred a

---

1. *See Federal Housing Finance Agency ("FHFA") v. UBS Americas, Inc., et al.,* 11 Civ. 5201(DLC); *FHFA v. JPMorgan Chase & Co., et al.,* 11 Civ. 6188(DLC); *FHFA v. HSBC North America Holdings, Inc., et al.,* 11 Civ. 6189(DLC); *FHFA v. Barclays Bank PLC, et al.,* 11 Civ 6190(DLC); *FHFA v. Deutsche Bank AG, et al.,* 11 Civ. 6192(DLC); *FHFA v. First Horizon National Corp., et al.,* 11 Civ 6193(DLC); *FHFA v. Bank of America Corp., et al.,* 11 Civ. 6195(DLC); *FHFA v. Citigroup Inc., et al.,* 11 Civ. 6196(DLC); *FHFA v. Goldman, Sachs & Co., et al.,* 11 Civ. 6198(DLC); *FHFA v. Credit Suisse Holdings (USA), Inc., et al.,* 11 Civ. 6200(DLC); *FHFA v. Nomura Holding America, Inc., et al.,* 11 Civ. 6201(DLC); *FHFA v. Merrill Lynch & Co.,*

*Inc., et al.,* 11 Civ. 6202(DLC); *FHFA v. SG Americas, Inc., et al.,* 11 Civ. 6203(DLC); *FHFA v. Morgan Stanley, et al.,* 11 Civ. 6739(DLC); *FHFA v. Ally Financial Inc., et al.,* 11 Civ. 7010(DLC).

2. The defendants are UBS Americas, UBS Real Estate Securities, Inc. ("UBS Real Estate"), UBS Securities, LLC ("UBS Securities"), Mortgage Asset Securitization Transactions, Inc. ("MASTR"), David Martin, Per Dyrvik, Hugh Corcoran, and Peter Slagowitz.

3. The mortgage originators in this case, none of whom are parties to the action, include Wells Fargo Bank, N.A.; Countrywide Home Loans; American Home Mortgage Corp.;

portfolio of loans to a trust that was created specifically for that securitization; this task was accomplished through the involvement of an intermediary known as a "depositor."[4] The trust then issued Certificates to an underwriter, in this case UBS Securities, which in turn, sold them to the GSEs. The Certificates were backed by the underlying mortgages. Thus, their value depended on the ability of mortgagors to repay the loan principal and interest and the adequacy of the collateral in the event of default.

Each of the Certificates implicated in this case was issued pursuant to one of seven Shelf Registration Statements filed with the Securities and Exchange Commission ("SEC"). Each individual defendant signed one or more of the two Shelf Registration Statements that pertained to the securitizations for which MASTR acted as depositor. The Registration Statement, together with the relevant prospectus and prospectus supplement constitute the "offering documents" for each security.

Generally, FHFA asserts that the offering documents for the twenty-two securitizations identified in the complaint "contained materially false statements and omissions."[5] More particularly, the SAC alleges that "[d]efendants falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the borrowers' capacity to repay their mortgage loans." The offering documents are also alleged to have contained representations regarding "the percentage of loans secured by owner-occupied properties and the percentage of the loan group's aggregate principal balance with loan-to-value ratios within specified ranges" that were both false and materially incomplete. Plaintiff asserts that "the false statements of material facts and omissions of material facts in the Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused Fannie Mae and

Fremont Investment & Loan; WMC Mortgage Corp.; IndyMac Bank, F.S.B.; and New Century Mortgage Corp.

4. For 16 of the 22 securitizations at issue in this case, defendant UBS Real Estate acted as the sponsor and defendant MASTR acted as the depositor.

5. The twenty-two securitizations at issue are: Argent Securities Inc. Trust, Series 2006–W3 ("ARSI 2006–W3"); Fremont Home Loan Trust, Series 2006–B ("FHLT 2006–B"); Home Equity Mortgage Loan Asset–Backed Trust, Series INABS 2005–C ("INABS 2005–C"); Home Equity Mortgage Loan Asset–Backed Trust, Series INABS 2005–D("INABS 2005–D"); Home Equity Mortgage Loan Asset–Backed Trust, Series INABS 2006–D ("INABS 2006–D"); Home Equity Mortgage Loan Asset–Backed Trust, Series INABS 2007–A ("INABS 2007–A"); MASTR Asset Backed Securities Trust, Series 2005–WF1 ("MABS 2005–WF1"); MASTR Asset Backed Securities Trust, Series 2005–FRE1 ("MABS 2005–FRE1"); MASTR Asset Backed Securi-

ties Trust, Series 2005–HE2 ("MABS 2005–HE2"); MASTR Adjustable Rate Mortgages Trust, Series 2005–8 ("MARM 2005–8"); MASTR Adjustable Rate Mortgages Trust, Series 2006–2 ("MARM 2006–2"); MASTR Adjustable Rate Mortgages Trust, Series 2006–0A1 ("MARM 2006–0A1"); MASTR Asset Backed Securities Trust, Series 2006–FRE2 ("MABS 2006–FRE2"); MASTR Asset Backed Securities, Series 2006–WMC2 ("MABS 2006–WMC2"); MASTR Asset Backed Securities Trust, Series 2006–WMC3 ("MABS 2006–WMC3"); MASTR Asset Backed Securities Trust, Series 2006–NC2 ("MABS 2006–NC2"); MASTR Asset Backed Securities, Series 2006–WMC4 ("MABS 2006–WMC4"); MASTR Asset Backed Securities Trust, Series 2006–NC3 ("MABS 2006–NC3"); MASTR Adjustable Rate Mortgages Trust, Series 2007–1 ("MARM 2007–1"); MASTR Asset Backed Securities Trust, Series 2007–WMCI ("MABS 2007–WMC1"); MASTR Adjustable Rate Mortgages Trust, Series 2007–3 ("MARM 2007–3"); and MASTR Asset Backed Securities Trust 2007–HE2 ("MABS 2007–HE2").

Freddie Mac to suffer billions of dollars in damages," because "[t]he mortgage loans underlying the GSE Certificates experienced defaults and delinquencies at a much higher rate than they would have had the loan originators adhered to the underwriting guidelines set forth in the Registration Statement."

## DISCUSSION

### I. FHFA's Claims are Not Barred by the Securities Act's Statute of Repose.

■ Defendants' chief argument in favor of dismissal is that this action is untimely because "all of Plaintiff's claims were extinguished no later than August 30, 2010—nearly one full year before the original complaint was filed on July 27, 2011." Defendants argue that this action is governed by Section 13 of the Securities Act, which sets forth the time limitations that generally apply to claims under Section 11 or Section 12(a)(2). Titled "Limitation of Actions," Section 13 provides:

> No action shall be maintained to enforce any liability created under section 77k [Section 11] or 77*l* (a)(2) [Section 12(a)(2)] of this title *unless brought within one year after the discovery of the untrue statement or the omission,* or after such discovery should have been made by the exercise of reasonable diligence .... *In no event shall any such action be brought* to enforce a liability created under section 77k or 77*l* (a)(2) of this title *more than three years after the security was bona fide offered to the public,* or under section 77*l* (a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m (emphasis added). Thus, under Section 13, a suit alleging that a defendant violated either Section 11 or Section 12(a)(2) must be filed (a) within one year of the date that the plaintiff discovered the violation, or (b) within three years of the date that the security was offered to the public, whichever is earlier. Courts sometimes refer to the former period as a "statute of limitations" and the latter period as a "statute of repose." *See P. Stolz Family Partnership L.P. v. Daum,* 355 F.3d 92, 102 (2d Cir.2004).

As noted above, FHFA's claims pertain to securities offerings that occurred between September 2005 and August 2007. Because these offerings occurred more than three years before July 27, 2011, when this suit was filed, under normal circumstances Section 13 would bar FHFA's Securities Act claims, irrespective of when the Agency "discovered" the violations that it alleges. FHFA does not dispute that this is so. It argues, however, that the timeliness of its claims is governed not by Section 13 but rather by HERA, which the Agency argues establishes superseding rules governing the timeliness of any action in which FHFA is a plaintiff.

In particular, FHFA relies on HERA § 1367(b)(12), which provides:

(A) In general—Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Agency as conservator or receiver shall be—

(i) in the case of any contract claim, the longer of—

(I) the 6-year period beginning on the date on which the claim accrues; or

(II) the period applicable under State law; and

(ii) *in the case of any tort claim,* the longer of—

(I) *the 3-year period beginning on the date on which the claim accrues; or*

(II) the period applicable under State law.

(B) Determination of *the date on which a claim accrues*—For purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in such subparagraph shall be the later of—

(i) *the date of the appointment of the Agency as* conservator or receiver; or

(ii) the date on which the cause of action accrues.

12 U.S.C. § 4617(b)(12) (emphasis added). In the Agency's view, HERA governs the timeliness of its Securities Act claims, to the exclusion of Section 13 entirely. For the claims at issue in this case, which accrued prior to the conservatorship and sound in tort, the Agency maintains that the only relevant timeliness concern is the three-year statute of limitations dictated by HERA. Thus, because FHFA was appointed conservator of the GSEs on September 6, 2008, it had until September 6, 2011 to bring this case, making it timely when filed on July 27, 2011.

Defendants dispute this reading of HERA. They argue that, to the extent it applies to federal claims at all, the statute's only effect with regard to the Securities Act was to relieve FHFA of the requirement that it file suit within one year of discovering the misrepresentations for which it seeks to recover; the three-year post-offering deadline remains in place. But this argument cannot be squared with HERA's text or purpose.

## A. "Statutes of Limitations" and "Statutes of Repose"

▮ Because the parties' disagreement turns on the meaning of HERA, a federal statute, we must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,* 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) (citation omitted). If a statute's language is unambiguous, "the sole function of the courts is to enforce it according to its terms." *Katzman v. Essex Waterfront Owners LLC,* 660 F.3d 565, 568 (2d Cir.2011) (citation omitted). As the Supreme Court has recently reminded us, however, when it comes to the meaning of a particular statutory phrase, "context matters." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S,* —— U.S. ——, 132 S.Ct. 1670, 1681, 182 L.Ed.2d 678 (2012); *see also id.* n. 6 (citing *FCC v. AT & T Inc.,* —— U.S. ——, 131 S.Ct. 1177, 1181–85, 179 L.Ed.2d 132 (2011), for the proposition that a proposed definition should be rejected where "it [does] not always hold in ordinary usage and the statutory context suggest[s] it [does] not apply"). Thus, when interpreting a statute, courts are not to "construe each phrase literally or in isolation." *Pettus v. Morgenthau,* 554 F.3d 293, 297 (2d Cir.2009). Rather, they must "attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Id.*

In contending that HERA does not affect Section 13's three-year deadline for claims under the Securities Act, defendants rely heavily on the semantic distinction between "statutes of limitations" and "statutes of repose." Although closely related, the two terms are, at least in theory, conceptually distinct:

"[S]tatutes of limitations bear on the availability of remedies and, as such, are subject to equitable defenses, the various forms of tolling, and the potential application of the discovery rule. In contrast, statutes of repose affect the availability of the underlying right: That right is no longer available on the expi-

ration of the specified period of time. In theory, at least, the legislative bar to subsequent action is absolute, subject to legislatively created exceptions set forth in the statute of repose."

*Stolz,* 355 F.3d at 102 (quoting Calvin W. Corman, Limitation of Actions, § 1.1, at 4–5 (1991)).

Relying on this distinction, defendants argue that because HERA addresses only "statutes of limitations" and makes no mention of "statutes of repose," it cannot have altered the three-year post-offering bar that Section 13 imposes on claims under the Securities Act. But, as is apparent even from the title of the treatise on which the *Stolz* Court relied, in ordinary usage, the semantic distinction between "statutes of repose" and "statutes of limitations" is not as clear as defendants would have us believe.

Indeed, Congress, the courts and learned commentators regularly use the term "limitations" to encompass both types of timeliness provision. As FHFA notes, Section 13 itself is entitled "Limitations on Actions," and nowhere uses the term "repose." *See* 15 U.S.C. § 77m. Even more tellingly, in 2002, Congress modified the repose period applicable to claims under the Securities Exchange Act of 1934, the Securities Act's cousin statute, in a provision entitled *"Statute of limitations* for securities fraud." Sarbanes–Oxley Act, Pub. K. No. 107–204, § 804, 116 Stat. 745, 801 (2002) (codified at 28 U.S.C. § 1658(b)) (emphasis added); see *Stolz,* 355 F.3d at 104 (acknowledging that this provision "extend[ed] the effective date of the statute of repose from three years to five years"). This Court and others in this District, well versed in the law of securities, have likewise used the term "statute of limitations" to invoke the three-year repose period on which the defendants rely here. *See In re*

*WorldCom, Inc. Sec. Litig.,* Nos. 02 Civ. 3288(DLC), 03 Civ. 9499(DLC), 2004 WL 1435356, at *3 (S.D.N.Y. June 28, 2004) (referencing "the three year statute of limitations contained in the Securities Act"); *id.* at *6 ("Prior to the enactment of Sarbanes–Oxley, the statute of limitations for Exchange Act claims was a one-year/three-year regime."); *In re Alcatel Sec. Litig.,* 382 F.Supp.2d 513, 522 (S.D.N.Y.2005) ("The Court need not address the three-year statute of limitations under section 13 of the Securities Act"); *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 198 (S.D.N.Y.2003) (Lynch, J.) (discussing "the one-year/three-year statute of limitations set forth in 15 U.S.C. § 77m"); *Griffin v. PaineWebber Inc.,* 84 F.Supp.2d 508, 512 n. 1 (S.D.N.Y.2000) (addressing the "3–year statute of limitations" applicable to claims under Section 12(a)(2) of the Securities Act).

■ Using the term "statute of limitations" to encompass both the narrow meaning intended by *Stolz* as well as any repose period makes sense, because, conceptually, a "statute of repose" must be understood in relation to the "statute of limitations" that it acts upon—that is as a limitation on the plaintiff's ability to argue that the regular time limit for bringing a claim should be tolled or that it began to run at some later-than-expected point. Indeed, when the only timeliness provision in a statute is one that is not subject to equitable defenses and is therefore absolute—in the terminology of *Stolz,* when the claim is governed only by a "statute of repose"—the law generally refers to the timeliness provision not as a "statute of repose" but as a "statute of limitations" that is "jurisdictional" in nature. *See John R. Sand & Gravel Co. v. United States,* 552 U.S. 130, 133–34, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008).[6]

As should be apparent from this discussion, the definition of "statute of limitations" proposed by the defendants does not always "hold in ordinary usage." *Novo Nordisk*, 132 S.Ct. at 1681 n. 6. Moreover, the statutory context strongly suggests that defendants' proposed definition of "statute of limitations" does not apply here.

Passed by the Senate during a special weekend session and signed by the President only days later, HERA is emergency legislation aimed at addressing some of the most pressing problems of the housing crisis—chief among them the questionable financial security of the GSEs. Consistent with this goal, Congress gave FHFA the power to appoint itself conservator of the GSEs and "take such action as may be—(i) necessary to put the [GSEs] in a sound and solvent condition; and (ii) appropriate to carry on the business of the [GSEs] and preserve and conserve [their] assets and property," 12 U.S.C. § 4617(b)(2)(D). In addressing the Agency's powers as conservator, Congress specifically referenced the "collect[ion of] all obligations and money

due to the [GSEs]." *Id.* § 4617(b)(2)(B)(ii). In order to facilitate these functions, HERA specified a "statute of limitations with regard to *any action* brought by the Agency as conservator" that, in the case of claims such as these, entitles the Agency to three years from the onset of the conservatorship to bring suit. As another court has recognized, the purpose of this provision was unambiguously to give FHFA "more time to decide whether and how to pursue any claims it inherited as [the GSEs'] newly-appointed conservator." *In re Fed. Nat. Mortg. Ass'n Sec., Deriv., ERISA Litig.*, 725 F.Supp.2d 169, 177–78 (D.D.C.2010), *reversed on other grounds by Kellmer v. Raines*, 674 F.3d 848 (D.C.Cir.2012).[7]

Reading HERA's reference to "statute of limitations" in the narrow fashion that defendants propose would undermine the congressional purpose of a statute whose overriding objective was to maximize the ability of FHFA to "put the [GSEs] in a sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D). The more natural reading of the provision, the one that is both

---

**6.** Admittedly, there is a formal distinction between *Stolz's* notion of a "statute of repose," which is envisioned as a substantive bar to recovery, and a jurisdictional statute of limitations, which bars the Court from acting on the plaintiff's claim but, in theory, does not alter her substantive rights. This difference is largely theoretical, however. What matters from the perspective of the "reasonable reader," *Pettus*, 554 F.3d at 297, is that the claim is categorically barred.

**7.** Defendants contend that while this may have been Congress's intent with respect to statutes of limitations, Congress could not have intended to affect statutes of repose for another reason as well. The argument turns on defendants' characterization of statutes of limitations as "procedural" and statutes of repose as "substantive." Defendants assert that because "a federal statute cannot rewrite state substantive law," HERA could not,

as a matter of federal power, displace state statutes of repose. Accordingly, they conclude that HERA's limitations provision must be read to apply only to statutes of limitations at both the state and federal levels.

Defendants' argument fails on two fronts. First, they have the legal doctrine backwards: state sovereignty principles primarily limit Congress's ability to affect state-court procedure, not its ability to modify state substantive law. *See Jinks v. Richland County*, 538 U.S. 456, 464, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003). Second, the Supreme Court has rejected defendants' argument that state statutes of limitation should be considered "procedural" for purposes of federalism analysis. Indeed, in *Jinks* itself, the Court recognized that federal legislation purporting to toll state statutes of limitations "falls on the 'substantive' side of the line" and is therefore within the federal power. *Id.* at 465, 123 S.Ct. 1667.

inline with everyday usage and consistent with the objectives of the statute overall, is that by including in HERA a provision explicitly setting out the "staute[s] of limitations" applicable to claims by FHFA, Congress intended to prescribe *comprehensive* time limitations for *"any action"* that the Agency might bring as conservator, including claims to which a statute of repose generally attaches.[8]

B. HERA's Statute of Limitations Provision Applies to Both Federal and State Claims.

Defendants next argue that HERA's limitations provision applies only to state statutes of limitations and, consequently, has no relevance to federal-law claims such as those that plaintiff brings under the Securities Act. In support of this argument, defendants point out chiefly that while HERA § 1367(b)(12) anticipates cases in which state tort and contract law might afford a statute of limitations longer than the three- and six-year periods specified, it makes no similar provision for federal statutes, such as the Racketeer Influenced and Corrupt Organizations Act, that carry a longer limitations period.

This argument fails in the face of the limitations provision's plain language, which states in unambiguous terms that it shall apply to *"any action* brought by the Agency as conservator," 12 U.S.C. § 4617(b)(12)(A) (emphasis added). De-

fendants' interpretation is also inconsistent with HERA's objective, discussed at length above, of facilitating FHFA's mission to "to put the [GSEs] in a sound and solvent condition" by, among other things, "collect[ing on] all obligations and money due to [them]." *Id.* § 4617(b)(2)(D), 4617(b)(2)(B)(ii).[9]

Although it may be the case, as defendants contend, that Congress could have been clearer about HERA's applicability to claims under federal law, "the mere possibility of clearer phrasing cannot defeat the most natural reading of a statute; if it could (with all due respect to Congress), we would interpret a great many statutes differently than we do." *Novo Nordisk A/S*, 132 S.Ct. at 1682. In this case, for the reasons that have been discussed at length in this Opinion, the most natural reading of Section 1367(b)(12) is that it affords FHFA three years from the date of conservatorship to bring suit on its Securities Act claims, irrespective of any other provision of law.

II. The GSEs' Claims Were Open When FHFA's Conservatorship Began.

Defendants also contend that, even if HERA governs the timeliness of Securities Act claims in general, plaintiff's particular claims were barred by Section 13's one-year statute of limitations before the relevant provision of the HERA took effect. As defendants note, HERA explicitly pro-

8. Defendants argue that in order to conclude that Section 13's three-year statute of repose does not apply to FHFA's claims, the Court would be required to conclude that HERA impliedly repealed that provision of the Securities Act. They are wrong. Even on the construction suggested by the plaintiff, Section 13 continues to apply with full force to the vast majority of litigants; HERA creates an exception for a single, privileged plaintiff—FHFA. Moreover, because, as explained above, HERA's reference to the "statute of limitations" encompasses not only the nar-

rower use of the term advocated by defendants but also what defendants refer to as "statutes of repose," HERA no more impliedly repealed the latter than it did the former. And even defendants agree that, to the extent it applies to federal claims, HERA constitutes a valid extension of Section 13's one-year limitation period.

9. For the same reasons the Court rejects defendants' argument, made in a footnote, that HERA does not apply to statutory claims.

vides that the statute does not revive claims for which the statute of limitations had expired prior to the conservatorship unless the claim arose from "fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the regulated entity." 12 U.S.C. § 4617(b)(13).

In order to show that plaintiff's Securities Act claims accrued and expired prior to the conservatorship, defendants cite a series of news accounts, lawsuits and other reports that they assert placed the GSEs on "inquiry notice" of the potential that the offering materials for these securities contained material misstatements or omissions. In focusing their arguments around when the GSEs had "inquiry notice," defendants rely on Second Circuit authority that plaintiff argues has been abrogated by the Supreme Court's decision in *Merck & Co. v. Reynolds,* —— U.S. ——, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010). Thus, before analyzing defendants' specific claims, some discussion of the accrual standard under the Securities Act is warranted.

**A. Accrual of Claims Under the Securities Act**

■ As noted, Section 13 of the Securities Act sets out the accrual standards and time limitations that apply to actions brought under Sections 11 or 12(a)(2). As relevant here, Section 13 provides:

> No action shall be maintained to enforce any liability created under section 77k or 77l (a)(2) of this title unless brought

within one year after the *discovery* of the untrue statement or the omission, *or after such discovery should have been made by the exercise of reasonable diligence . . .*

15 U.S.C. § 77m (emphasis added). The equivalent provision governing claims under the Exchange Act reads, in relevant part:

> [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934, may be brought not later than ... 2 years after the *discovery* of the facts constituting the violation. . . .

28 U.S.C. § 1658 (emphasis added).

Unlike Section 13, the Exchange Act provision omits any reference to circumstances in which discovery of the basis for the claim "should have been made by the exercise of reasonable diligence." Nonetheless, prior to *Merck,* the law in this Circuit was that the accrual standards under the two statutes were identical. *See Dodds v. Cigna Secs., Inc.,* 12 F.3d 346, 349–50 (2d Cir.1993).[10] Thus, a potential plaintiff under either the Securities Act or the Exchange Act was deemed to have "discover[ed]" an untrue statement or omission upon obtaining "actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg,*

---

**10.** Although the Sarbanes–Oxley Act of 2002 ("SOX"), Pub.L. No. 107–204, 116 Stat. 745, lengthened the limitations periods available to Exchange Act plaintiffs, the key accrual language was left unchanged. Before SOX, claims under Section 10(b) of the Exchange Act were governed by the statute of limitations applicable to private claims of market manipulation under Section 9(e) of the original Act. That provision read, in part:

> No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation. *See Dodds,* 12 F.3d at 350 n. 2 (quoting 15 U.S.C. 78i(e) (1988)).

*Kravis, Roberts & Co.,* 970 F.2d 1030, 1042 (2d Cir.1992). Moreover, the prevailing view in this Circuit became that the two statutes "impose[d] a duty of inquiry," that was triggered when "the circumstances [were] such as to *suggest* to a person of ordinary intelligence the probability" that she had a cause of action. *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.,* 32 F.3d 697, 701 (2d Cir.1994) (emphasis added) (citation omitted).

In *Merck,* the Supreme Court rejected the Second Circuit's "inquiry notice" standard as applied to the accrual of claims under the Exchange Act. As the Court explained, "the 'discovery' of facts that put a plaintiff on 'inquiry' notice does not automatically begin the running of the limitations period." 130 S.Ct. at 1798. "If the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'" *Id.* at 1797.

The Court acknowledged, however, that, "'discovery' in respect to statutes of limitations for fraud has long been understood to include discoveries a reasonably diligent plaintiff would make." *Id.* at 1795. Accordingly it declined to fashion a rule that would require an Exchange Act plaintiff, in all cases, to possess actual knowledge of the facts constituting the violation before the statute of limitations could begin to run. Rather, the Court concluded that the limitations period under the Exchange Act begins to run upon discovery of, or when "a reasonably diligent plaintiff would have discovered, the facts constituting the violation." *Id.* at 1798 (quoting 28 U.S.C. § 1658(b)(1)). Following *Merck,* the Second Circuit has held that a fact is not "discovered" for the purposes of Exchange Act claims until "a reasonably diligent

plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc.,* 637 F.3d 169, 175 (2d Cir.2011).

The Second Circuit has yet to rule on whether *Merck's* holding extends beyond the context of the Exchange Act to claims under the Securities Act. But the majority of district courts that have considered the matter have concluded that it does. *See In re Bear Stearns Mortgage Pass–Through Certificates Litig.,* 851 F.Supp.2d 746, 762 (S.D.N.Y.2012); *In re Wachovia Equity Sec. Litig.,* 753 F.Supp.2d 326, 370–71 & n. 39 (S.D.N.Y.2011); *Brecher v. Citigroup Inc.,* 797 F.Supp.2d 354, 367 (S.D.N.Y.2011); *New Jersey Carpenters Health Fund v. Residential Capital, LLC,* Nos. 08 CV 8781(HB), 08 CV 5093(HB), 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011); *but see In re IndyMac Mortgage–Backed Securities Litig.,* 793 F.Supp.2d 637, 648 (S.D.N.Y.2011).

The majority position makes good sense. Both statutes use the plaintiff's "discover[y]" of the factual predicate of the claim as the triggering date for the statute of limitations. Although the Securities Act includes the qualification that the limitations period may also begin to run "after such discovery should have been made by the exercise of reasonable diligence," 15 U.S.C. § 77m, the *Merck* Court interpreted the use of the term "discover" in the context of the Exchange Act to embrace an essentially identical diligence requirement and nonetheless concluded that the inquiry standard that defendants advocate in this case was excessively broad.

Given that the Supreme Court has interpreted the Exchange Act's "discovery" standard to imply the diligence requirement that the Securities Act makes explicit, there appears to be no principled reason to depart from the precedents of this Cir-

cuit holding that the accrual standards under the two statutes are to be interpreted identically. *See Dodds,* 12 F.3d at 349–50. Indeed, the *Merck* Court itself described with approval the longstanding practice of adopting the Securities Act's explicit "reasonable diligence" standard for the Exchange Act accrual date, despite "the omission of an explicit provision to that effect." *Merck,* 130 S.Ct. at 1795. Accordingly, the Court concludes that the statute of limitations for FHFA's Securities Act claims did not begin to run until "a reasonably diligent plaintiff" in the GSEs' position would have had "sufficient information about [a given misstatement or omission] to adequately plead it in a complaint." *City of Pontiac,* 637 F.3d at 175.

## B. The GSEs' Discovery of Defendants' Alleged Misstatements

█ Applying the accrual standard set out in *Merck* and *City of Pontiac,* the Court has little trouble concluding that FHFA's Securities Act claims were open at the time the time the GSEs were placed into conservatorship. As discussed in greater detail below, the essence of the Agency's case is that the offering materials for the securitizations at issue here included materially false or misleading information regarding: (1) the value of the underlying mortgage properties; (2) the percentage of underlying properties that were owner occupied; and (3) the degree to which the underlying mortgage loans were underwritten in accordance with certain risk guidelines. To support these allegations, the SAC relies principally on FHFA's own survey of loan-level data for a sample of mortgage loans in each securitization, which the Agency argues, reveals that the offering materials contained material inaccuracies with regard to each of the three categories of information. To support the allegation that defendants failed to act diligently to ensure that loans included in the securitizations had been underwritten in accordance with the risk guidelines set out in the offering materials, the SAC also cites a series of government and private reports that have revealed systematic underwriting failures by many of the mortgage originators whose loans were included in the Securitizations.

Defendants seize on this last point, noting that a myriad of legal complaints, government investigations, news articles and statements by the GSEs' own representatives makes clear that the originators' questionable loan practices were widely known as early as September 2007. From this fact, defendants conclude that "Fannie Mae and Freddie Mac ... were on notice of the misrepresentations and omissions about which they complain" more than a year before September 6, 2008, when they were placed into conservatorship. As noted above, however, under *Merck* the relevant question in assessing the timeliness of these claims is not when the GSEs were put "on notice" of the potential that the prospectuses included material misstatements or omissions, but rather when they, or a reasonably diligent plaintiff in their position, could have "discovered" that this was so with sufficient particularity to plead a Securities Act claim that would survive a motion to dismiss.

To the extent defendants contend *this* standard was met as early as September 2007, that claim is significantly undercut by the assertion elsewhere in their motion to dismiss that FHFA has, even now, failed to allege facts sufficient to support a claim under the Securities Act. Recognizing this tension in their argument, defendants attempt to turn the tables on the plaintiff—asserting that "either the information in the SAC is insufficient to plead its claims, or Plaintiff had enough information to plead its claims prior to September 2007." But defendants pose a false dichot-

omy. Between 2007 and the filing of this complaint an important event occurred that caused the GSEs to discover that the loans included in the securitizations they bought from defendants were not as advertised: the securities were downgraded from investment grade to near-junk status. The earliest of those downgrades occurred on February 15, 2008 for Freddie Mac, and March 3, 2008, for Fannie Mae—less than a year before September 6, 2008, when the GSEs were placed into conservatorship.

The truth of the matter is that when the GSEs learned of the loan originators' dubious underwriting practices says little about when they discovered the facts that form the basis of this complaint. FHFA's claim here is not that the *originators* failed to scrutinize loan applicants adequately *in general;* it is that *defendants* failed to act diligently to ensure that, consistent with the representations in the offering materials, the originators' questionable practices did not lead to the inclusion of non-conforming loans in the *particular* securitizations sold to the GSEs. The downgrade of the securities' credit ratings and the results of the loan audit that FHFA undertook in response to that action are crucial to the Agency's claim in this regard, since they are the only facts that connect the originators' general practices to particular securities that the GSEs bought from defendants. *Accord In re Bear Stearns Mortg. Pass–Through Certs. Litig.,* 851 F.Supp.2d at 765 ("[A]bsent a decline in the Certificates' ratings (or some other indicator of a steep decline in the Certificates' value), it is difficult to see how a plaintiff could have plausibly pled that the epidemic of indiscretions in the MBS in-

dustry had infected his or her Certificates."). Indeed, several courts in this district have concluded that, even under the pre-*Merck,* duty-of-inquiry standard for accrual, generalized reports like those relied upon by defendants are insufficient to trigger the statute of limitations. *See, e.g., Pub. Emples. Ret. Sys. v. Merrill Lynch & Co.,* 714 F.Supp.2d 475, 479–80 (S.D.N.Y.2010).

The 2007 reports, lawsuits and investigations regarding loan origination practices cited by defendants may have signaled a potential for problems in the RMBS market generally—and may, as plaintiff suggests, have triggered a duty on the part of *defendants* to scrutinize the loans included in their securitizations more closely—but such reports were insufficient to trigger the Securities Act's statute of limitations. Until such time they did or with diligence should have "discovered" otherwise, the GSEs were entitled to rely on defendants' assertion that the loans that underlay these particular securities complied with the guidelines set out in the offering materials.[11] The public reporting discussed in the SAC is relevant to plaintiff's claims only insofar as it negates any effort by defendants to maintain that they exercised due diligence or reasonable care to ensure that the loans included in the securitizations were as described. *See In re Morgan Stanley Info. Fund Sec. Litig.,* 592 F.3d 347, 359 n. 7 (2d Cir.2010) (recognizing that "section 11 provides several due diligence defenses available to non-issuer defendants, *see* 15 U.S.C. § 77k(b), and section 12(a)(2) contains a 'reasonable care' de-

---

11. For this reason, the fact that, in August 2007, Freddie Mac sued American Home Mortgage ("AHM"), one of the originators at issue here, asserting that AHM had sold it loans "determined to be of non-investment quality" is not sufficient to show that the claims at issue here had accrued as of that date. The GSEs were entitled to assume that defendants had made diligent efforts to ensure that the originators' dubious lending practices did not infect the particular loans included in these securitizations.

fense, *id.* § 77*l* (a)(2)."). Whatever questions the GSEs might have harbored in 2007 about the quality of the securitizations they bought from defendants, it cannot be said that they should have "discovered" that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the ratings agencies in early 2008. The claims were therefore open in September 2008 when FHFA's conservatorship began.

### III. FHFA Has Standing to Bring This Action.

HERA provides that during the period beginning with the creation of FHFA and "ending on the date on which the [FHFA] Director is appointed and confirmed, the person serving as the Director of the Office of Federal Housing Enterprise Oversight [OFHEO] of the Department of Housing and Urban Development . . . shall act for all purposes as, and with the full powers of, the Director." 12 U.S.C. § 4512(b)(5). Consistent with this provision, James Lockhart, the President-appointed and Senate-confirmed Director of OFHEO, led FHFA from the time of its creation until the President designated Edward Demarco as Acting Director of FHFA on August 25, 2009.

Defendants contend that Section 4512(b)(5) violates the Appointments Clause of the Constitution, which provides, as relevant here, that "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Defendants maintain that because Lockhart, an inferior officer, was not separately nominated and confirmed to lead FHFA, his directorship

was an unconstitutional congressional appointment and that, consequently, the actions that he took as Acting Director—including placing Fannie Mae and Freddie Mac into conservatorship—were invalid under the Appointments Clause. They further argue that because Lockhart never validly served as Director of FHFA, his resignation could not trigger the provision under which DeMarco was appointed, so that the constitutional defect in Lockhart's appointment infects DeMarco's tenure as Acting Director as well. These claims are meritless.

■ It is well established that Congress may confer on validly appointed officers "additional duties, germane to the offices already held by them . . . without thereby rendering it necessary that the incumbent should be again nominated and appointed." *Shoemaker v. United States,* 147 U.S. 282, 301, 13 S.Ct. 361, 37 L.Ed. 170 (1893); *accord Weiss v. United States,* 510 U.S. 163, 171–75, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994); *Lo Duca v. United States,* 93 F.3d 1100, 1110 (2d Cir.1996). Defendants do not seriously contend that the functions that HERA assigned to the Director of FHFA were not germane to those that Lockhart was already performing as the Director of OFHEO. HERA transferred the "functions, personnel, and property" of OFHEO from the Department of Housing and Urban Development to the newly created FHFA, which, like OFHEO, was tasked primarily with overseeing the operations of the GSEs. *See HERA,* tit. III, 122 Stat. 2794–2799 (codified at 12 U.S.C. § 4511 note). The powers that HERA assigned to FHFA beyond those previously enjoyed by OFHEO were intended to further this common mission and thus entirely germane to Lockhart's previous function.[12] Defendants' Appointments Clause challenge therefore fails.

**12.** To the extent this conclusion is inconsis- tent with *Olympic Fed. Sav. & Loan Ass'n v.*

III. FHFA Has Adequately Pled Violations of the Securities Act.

Defendants also maintain that FHFA has failed to plead sufficient facts to state a claim under the Securities Act. Because FHFA does not allege that the defendants engaged in fraud, its pleadings are governed by Federal Rule of Civil Procedure 8(a)(2), which requires that the complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although this rule "does not require detailed factual allegations, ... a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (citation omitted).

The SAC asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act. Section 11 provides a private cause of action against the issuers and other signatories of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," 15 U.S.C. § 77k(a). A fact is material for the purposes of Section 11 if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *Hutch-*

*ison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir.2011) (citation omitted). Section 12(a)(2) imposes liability under similar circumstances with respect to prospectuses and oral communications, 15 U.S.C. § 77*l* (a)(2). Neither provision requires allegations of scienter, reliance, or loss causation in order to state a claim. *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 (2d Cir.2011). Section 15 extends "control person" liability to "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under [Section 11] or [Section 12]." 15 U.S.C. § 77*o*.

As noted above, FHFA identifies three principal categories of what it argues is misleading or false information in the offering materials that accompanied the RMBS at issue here. First, the Agency asserts that the prospectus supplements understated the loan-to-value (LTV) ratio of the underlying mortgage pools. Second, it contends that the offering materials overstated the percentage of properties in the supporting loan groups that were owner occupied. Finally, FHFA maintains that the offering materials represented that the underlying mortgage loans were underwritten according to certain risk guidelines when, in fact, "there were pervasive and systematic breaches of those guidelines." Defendants contend that the SAC fails to state a claim with respect to any of the three categories of statements.[13]

*Dir., Office of Thrift Supervision*, 732 F.Supp. 1183, 1193 (D.D.C.1990), the Court respectfully disagrees with that decision.

**13.** In a footnote, defendants also maintain that, in addition to failing adequately to allege conduct violative of the Securities Act, the SAC does not assert that MASTR was a "statutory seller," a necessary condition for establishing liability under Section 12. This argument is easily rejected. A person is a "statutory seller"—and therefore a proper

Section 12(a)(2) defendant—if he "successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359 (citation omitted). Consistent with this definition, the SAC alleges that MASTR "actively participated in the solicitation of the GSEs' purchase of the GSE Certificates, and did so in order to benefit itself."

## A. LTV Ratio

The offering materials for each securitization included group-level representations regarding the LTV ratios of the underlying mortgages. For any given mortgage, the LTV ratio is determined by computing the balance of the loan as a percentage of the value of the property that secures it, often determined on the basis of an appraisal. LTV ratio is a measure of credit risk. The higher the ratio, the less equity the homeowner has in the property, and the more likely she is to default. Mortgages with an LTV ratio in excess of 100% are "underwater," and are highly susceptible to default, because the homeowner has little financial incentive to continue making payments in the event her financial circumstances change or the value of her home further declines. Such mortgages are highly risky for note holders, because the value of the property is insufficient to cover the balance of the loan in the event of a default.

Just as LTV ratio is a measure of the riskiness of an individual home loan, so too is it an indicator of the investment-worthiness of a security backed by the income from many such loans. Each Prospectus Supplement that defendants signed in connection with these offerings included statistics regarding the distribution of LTV ratios across the underlying loan pool. For example, the Prospectus Supplement prepared regarding the MABS 2007–WMC1 Securitization, cited in the complaint, represented that none of the mortgages in the supporting loan group had an LTV ratio in excess of 100% and that "approximately 29.24% of the Group I Mortgage Loans [whose certificates the GSEs purchased] had loan-to-value ratios . : . in excess of 80.00%."

FHFA alleges that these figures, and similar LTV information reported in the offering materials for the other twenty-one issuances, were material to the GSEs in deciding whether to invest in the securities. It further alleges these data were false and therefore actionable under Sections 11 and 12(a). In support of the latter assertion, the Agency cites the results of its own review of loan-level data for a sampling of mortgage loans included in each securitization. The data review, which used an automated valuation model to estimate the property value at the time of origination for each loan sampled, revealed that, for each securitization at issue here, the Prospectus Supplement significantly understated the percentage of loans with an LTV ratio in excess of 80%. Moreover, although the Prospectus Supplements indicated that the securitizations included no loans that were underwater, the Agency found that, with regard to seventeen of the securitizations, underwater loans accounted for 10% or more of the sample. In the case of the MABS 2007–WMC1 Securitization, for example, the Agency found that while the prospectus supplement indicated that only about 29.24% of the relevant loans had LTV ratios above 80%, the actual number was 61.97%. The data review also determined that 18.55% of the loans sampled in the MABS 2007–WMC1 Securitization had LTV ratios in excess of 100%.

Defendants counter that the LTV ratios and the housing appraisals that underlie them are statements of opinion that cannot give rise to liability under Sections 11 and 12(a)(2). They note that appraisal value is a subjective determination that is largely a function of the particular methods and assumptions employed by the appraiser, and that claims under the Securities Act generally lie only when there has been an "untrue statement of a material *fact*," 15 U.S.C. § 77k(a) (emphasis added). In support of their position, defendants cite a series of cases from this District, which

they claim, hold that LTV ratios are, at root, opinion statements and therefore nonactionable under the Securities Act. Defendants misstate the holdings of these cases and the law in this area.

1. Opinion Liability Under the Securities Act

██ It is true, as defendants note, that Sections 11 and 12(a)(2) of the Securities Act impose liability only for an omission or "untrue statement of a material *fact*." 15 U.S.C. §§ 77k(a), 77*l* (a)(2) (emphasis). But "matters of belief and opinion are not beyond the purview of these provisions." *Fait*, 655 F.3d at 110. In *Fait*, the Second Circuit concluded that statements in the offering materials for certain securities that purported to convey management's estimates of goodwill in an acquired company, despite "depend[ing] on management's determination of the 'fair value' of assets acquired and liabilities assumed, which are not matters of objective fact," could nevertheless give rise to liability under the Securities Act, provided the plaintiff could show that the estimates were both objectively false and disbelieved by the speaker when made ("subjectively false"). *See id.* at 113.

Defendants and FHFA agree that the statements regarding LTV ratios at issue in this case depend on appraisers' estimates regarding the values of the underlying properties and that because those values "are not matters of objective fact," *Fait* governs plaintiff's claims in this respect. They disagree only about the identity of the "speaker" whose disbelief in the statements plaintiff must plead. Plaintiff contends that it is sufficient under *Fait* that the SAC alleges that the appraisers, who are not defendants in this case, did not believe that the valuations they assigned to the underlying properties were accurate. Defendants counter that in or-

der to state a claim adequately under *Fait*, plaintiff must assert that the statement upon which it seeks to predicate liability "was both objectively false and disbelieved by the *defendant* at the time it was expressed." *Fait*, 655 F.3d at 110 (emphasis added). Although, admittedly, there is dictum in *Fait* that superficially supports defendants' claim, upon closer examination of that decision and its reasoning, the Court is convinced that plaintiff has the better of the argument.

The confusion surrounding whom *Fait* requires to have disbelieved an opinion statement in order for it to be actionable under the Securities Act can be explained largely by the fact that, in the majority of cases, the opinion upon which the plaintiff seeks to rely is an opinion first articulated by one or more of the Securities Act defendants. In *Fait* itself, for example, Regions Financial Corporation was both a defendant in the Securities Act case and the originator of the goodwill estimates that the plaintiffs alleged were materially false. *Id.* at 110–12; *see also In re Gen. Elec. Co. Sec. Litig.*, No. 09 Civ.1951(DLC), 856 F.Supp.2d 645, 656, 2012 WL 1371016, at *9 (S.D.N.Y. Apr. 18, 2012) (analyzing officer-defendant's statement that "in the recent market volatility, we continue to successfully meet our commercial paper needs.") *Fait*, therefore, did not require the Second Circuit to address the issue that the parties pose here: how to treat opinions that the offering materials attribute to someone other than a defendant. *Fait's* reasoning is, however, helpful in addressing this question. It points squarely in favor of plaintiff's position, imposing upon the plaintiff the duty to plead that the person who formed the opinion did not believe the opinion when she expressed it.

As noted above, *Fait* recognized a narrow set of circumstances under which

statements of opinion may constitute an "untrue statement of a material fact," 15 U.S.C. §§ 77k(a), 77l (a)(2), and therefore support liability under the Securities Act. In reaching this outcome, the Second Circuit relied heavily on the Supreme Court's analysis in *Virginia Bankshares, Inc. v. Sandberg,* which recognized that statements of opinion or belief "are factual in two senses: as statements that [the person to whom the belief is ascribed] ... hold[s] the belief stated and as statements about the subject matter of the ... belief expressed." 501 U.S. 1083, 1092, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991).

In order to understand the Court's reasoning, it is helpful to analyze it in the context of this case. Here, for example, the Prospectus Supplement for the MABS 2007–WMC1 Securitization represented that 29.24% of the loans in the relevant group had LTV ratios above 80%. This representation is equivalent to a claim that, for the remaining 70.76% of loans, an appraiser subjectively valued the mortgage security at or above 125% of the relevant loan amount.

The valuations are, of course, the subjective judgments of the appraisers. *See In re Salomon Analyst Level 3 Litig.,* 373 F.Supp.2d 248, 251–52 (S.D.N.Y.2005) (Lynch, J.) ("[V]aluation models depend so heavily on the discretionary choices of the modeler ... that the resulting models and their predictions can only fairly be characterized as subjective opinions."). But although the appraisals are matters of opinion in one sense, they also constitute factual statements: that the appraised value represents the appraiser's true belief as to the value of the property. *Fait* holds that, under the Securities Act, liability may attach to this implied assertion—that the originator of the opinion sincerely holds the belief reported—where the assertion is shown to be false. Ap-

plied to this case, the plaintiff alleges that the appraisers did not accurately communicate their subjective views regarding the value of the properties at issue. To put it bluntly, the plaintiff asserts that the appraisers did not actually believe that the homes underlying the LTV ratios were worth as much as the appraisers reported they were worth.

Plaintiff is therefore correct that the "subjective falsity" that *Fait* requires in order to impose Securities Act liability based on a statement of opinion is falsity on the part of the originator of the opinion, who may or may not be a Securities Act defendant. This conclusion is confirmed by the practice in federal court with respect to opinion-based Securities Act claims in multi-defendant cases. The Securities Act does not require a defendant-specific showing of subjective falsity in order to impose liability for opinion statements, nor do defendants argue that such a requirement exists. Indeed, in *Fait* the Second Circuit seemed to assume that if the complaint had alleged that the company's representations regarding goodwill "falsely represented the speakers' beliefs at the time they were made," 655 F.3d at 107, such an allegation would be sufficient to state a claim against not only the company, but also against the individuals, underwriters and accounting firm named in the complaint. Defendants have articulated no legal principle that would distinguish their position in this case from that of an underwriter that is subjected to Securities Act liability based on insincere statements of opinion by its issuer co-defendant.

Indeed, the fact that *Fait* requires a showing of "subjective falsity" only on the part of the originator of an opinion statement serves to clarify the relationship between "subjective falsity" and scienter in the context of claims under the Exchange Act. Although the *Fait* Court was careful

to emphasize that the concepts are different, *see* 655 F.3d at 112 n. 5, courts have struggled to distinguish these two lines of inquiry, in part because, where the originator of the opinion is a defendant, "proving the falsity of the statement 'I believe this investment is sound' is the same as proving scienter." *Podany v. Robertson Stephens, Inc.,* 318 F.Supp.2d 146, 154 (S.D.N.Y.2004). Once it is acknowledged that the "subjective falsity" inquiry is directed at determining the truth of the statement, "I believe," rather than the fraudulent intent of any defendant who later reports that claim, the distinction becomes clearer. And, of course, while a plaintiff must plead scienter for each Exchange Act defendant, under the Securities Act the plaintiff need only allege subjective falsity as to the originator of the opinion expressed in the offering documents.

Although they are not dispositive of the issue, policy considerations also make plain that this interpretation of *Fait's* "subjective falsity" requirement is the correct one. A statement of opinion included in a registration statement or other offering document is material from the perspective of the reasonable investor only to the extent that the person to whom the opinion is attributed has particular expertise with regard to the matter about which the opinion is rendered. In other words, what makes the opinion statement relevant and worthy of inclusion in the offering materials is that it purports to represent the view of an individual whose judgment matters. As noted, this person will often be an agent, director, or underwriter of the company issuing the securities, but it need not necessarily be. For instance, in this case representations regarding LTV ratios—and the property value estimates that underlay them—were material to investors precisely because they believed that these figures represented the sincere judgments of professional appraisers with experience

making these sorts of assessments. Without a doubt it is as important to investors that the appraisers truly believed the estimates on which the LTV ratios were built as it is that defendants—who tabulated and reported appraisal values following the completion of their due diligence inquiry—believed that this information was correct.

█ Finally, this reading of *Virginia Bankshares* and *Fait* is entirely consistent with the Structure of the Securities Act and the affirmative defenses that it makes available to defendants under Sections 11 and 12(a)(2). Where a non-issuer defendant can show that he conducted a "reasonable investigation" and concluded that the statements contained in the registration statement were true, he can avoid liability under Section 11. *See* 15 U.S.C. § 77k(b)(3)(A); *In re WorldCom, Inc. Secs. Litig.,* 346 F.Supp.2d 628, 662 (S.D.N.Y.2004). Section 12(a)(2) likewise permits a defendant to avoid liability by making an affirmative showing that he exercised "reasonable care" to avoid any untruth or omission. *See* 15 U.S.C. § 77l (a)(2). "Underwriters function as the first line of defense with respect to material misrepresentations and omissions in registration statements," *WorldCom,* 346 F.Supp.2d at 662, and it is entirely appropriate to impose on them the obligation to vet the accuracy of opinion statements attributed to third parties. But the availability of these defenses gives some comfort that Securities Act defendants will not be held liable for inaccuracies that they truly could not have prevented.

## 2. Application

█ In light of the forgoing analysis, FHFA has alleged actionable misrepresentations with regard to the LTV ratios that defendants reported in their offering materials. Since the materiality of this infor-

mation is undisputed, the only issue is whether the Agency has adequately alleged that the property appraisals—as presented through the LTV ratios—"were both false and not honestly believed when made." *Fait*, 655 F.3d at 113.

The loan-sampling results reported in the SAC are sufficiently suggestive of widespread inaccuracies in appraisal value to render plausible the Agency's claim that the LTV information reported in the offering materials was "objectively false." As discussed above, FHFA's analysis of the loan data suggests that the Prospectus Supplement for the MABS 2007–WMC1 Securitization overstated the percentage of loans with an LTV ratio at or below 80% by over 30%. The Agency reports similar findings with respect to the other twenty-one securitizations at issue here.

The allegations in the SAC likewise satisfy Fait's "subjective falsity" requirement. The SAC asserts that "appraisers themselves routinely furnished appraisals that the appraisers understood were inaccurate and that they knew bore no reasonable relationship to the actual value of the underlying property." To support this claim, the SAC cites a series of news stories, lawsuits and government investigations that have revealed instances in which appraisers connected to some of the mortgage originators at issue here were found to have systematically and knowingly overstated the value of homes in order to allow borrowers to obtain larger loans than they could afford. The SAC also alleges that the LTV data reported in the offering materials deviates so significantly from the results of plaintiff's loan-loan level analysis as to raise a plausible inference that the appraisers knowingly inflated their valuations.

### B. Owner–Occupancy Rates

Defendants next attack FHFA's allegation that the offering materials overstated the percentage of properties in the supporting loan group for each securitization that were owner occupied. The prospectus supplement for each securitization provided a break-down of the mortgages in the supporting loan group based on whether the property that secured the loan was owner occupied, a second home, or an investment property. Staying with the example of the MABS 2007–WMC1 Securitization, the prospectus supplement reported that, for the Group I certificates that the GSEs purchased, 1,810 (or 98.32%) of the 1,841 underlying properties were owner occupied. This information was material to investors, because a borrower whose primary residence is the mortgaged property is less likely to default than one who uses it as a second home or as an investment.

FHFA contends that the owner-occupancy information in the prospectus supplement for the MABS 2007–WMC1 Securitization, as well similar information reported for the other twenty-one securitizations at issue here, was false. As part of its survey of the loan group supporting each securitization, FHFA used a number of tests in an effort to determine whether the owner-occupancy information reported in the prospectus supplements was accurate. Specifically it examined whether (1) a borrower's property tax bill was being mailed to the mortgaged property six months after the loan closed; (2) whether the borrower claimed an owner-occupied tax exemption on the mortgaged property; and (3) whether the mailing address of the property was reflected in the borrower's credit reports, tax records, or lien records. The survey revealed that 13.11% of the loans in the supporting loan group for the MABS 2007–WMC1 Securitization failed two or more of these

tests, indicating that in all likelihood these properties were not owner occupied. The Agency contends that the 11.62% difference between its own findings and the owner-occupancy numbers reported in the prospectus supplement is a strong indicator that the reported data was materially false at the time of origination. Its survey reveals similar discrepancies with regard to the other securitizations at issue in this case.

Defendants do not dispute that the SAC adequately alleges that the reported rates of owner occupancy were material. They maintain instead that, because the prospectus supplements for sixteen of the twenty-two securitizations included a disclaimer that owner-occupancy statistics were "as reported by the mortgagor at the time of origination," the SAC was required to allege that the representations incorporated into the offering materials were not in fact made by the borrowers at the time of origination. As plaintiff notes, by its own terms, defendants' argument does not apply to six of the twenty-two securitizations cited in the SAC. In any case, as outlined below, defendants' contention that the Agency was required to allege falsity on the part of the underlying borrowers is without merit.

1. Securities Act Liability for Third-Party Statements of Fact

■ As noted, liability under the Securities Act is strict liability. Section 11 of the Act provides that any signer, director of the issuer, preparing or certifying accountant, or underwriter may be liable if "*any part* of the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact." 15 U.S.C. § 77k(a). Section 12(a)(2) likewise imposes liability on "*any person* .... who offers or sells a security by means of a prospectus or oral communi-

cation, which includes an untrue statement of a material fact or omits to state a material fact." 15 U.S.C. § 77*l* (a)(2).

As the Supreme Court has recognized with regard to Section 11, these provisions are designed "to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). If defendants were correct that a party could transform the Securities Act's strict liability regime into one that required scienter simply by attributing factual information in the offering materials to a non-defendant third-party, this purpose would be significantly undermined.

■ Defendants' position is also inconsistent with the structure of statute. Although the liability of issuers under Section 11 is "virtually absolute," *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d at 359 (citation omitted), Section 11 provides an affirmative defense of "due diligence" that is available to defendants other than the issuer of the security. *See* 15 U.S.C. § 77k(b)(3); *World-Com*, 346 F.Supp.2d at 659, 662–64 (S.D.N.Y.2004). As is true of all affirmative defenses, a Securities Act defendant generally bears the burden of demonstrating his due diligence, and, for that reason, due diligence cannot be asserted as a basis for dismissal pursuant to Rule 12(b)(6). *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d at 359 n. 7.

For present purposes, the precise contours of the due diligence defense are less important than the fact that, in setting out the defense, the Securities Act specifically contemplates circumstances in which a plaintiff's *prima facie* case is founded on a factual assertions in the registration statement "purporting to be a copy of or ex-

tract from a report or valuation of [a third-party] expert," or "purporting to be a statement made by an official person." 15 U.S.C. § 77k(b)(3)(B)-(D). These provisions discuss in detail the "due diligence" showing required to avoid liability for such an assertion and nowhere suggest that the plaintiff's *prima facie* case is somehow undermined by the attribution of the information to a third-party. It is thus plain from the statutory structure itself that a Securities Act defendant cannot simply claim that she blindly reported information given to her by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials.

### 2. Application

■ Turning to plaintiff's specific claim that the offering documents for these securitizations contained material misstatements regarding owner-occupancy, the SAC adequately states a claim for relief under the Securities Act. As discussed above, defendants do not dispute that the SAC adequately alleges that the reported rates of owner occupancy were material to a reasonable investor's decision whether to buy the securities. Nor do they challenge the Agency's finding that borrowers' credit reports and lien records provide a plausible basis for inferring that the true rates of owner occupancy were substantially lower than those reported in the offering materials. Moreover, as set forth above, the Securities Act does not condition liability on a showing that defendants themselves inaccurately represented the data that they received from the borrowers.

Defendants only remaining argument is that the Agency's survey, which examined, among other things, where borrowers' property tax bills were being mailed six-months after the loan closed, does not establish that *at the time of origination* owner-occupancy rates differed from those reported in the offering materials. Whether or not defendants are correct with regard to the proof that would be required at trial, at the very least, the Agency's survey results render plausible its claim that the owner-occupancy rates reported in the offering materials were materially false. That is all that is required at this stage of the litigation.

### C. Compliance With Underwriting Standards

The prospectus and prospectus supplement for each of the securitizations at issue in this case described the underwriting guidelines that were said to govern the origination of mortgages with whose income the securitization was backed. The MABS 2007–WMC1 Securitization, already discussed in the context of FHFA's other claims, provides a useful example.

MABS 2007–WMC1 was assembled from mortgages originated by WMC Mortgage Corp., a mortgage banking company incorporated in California. Defendant MASTR acted as the depositor for the securitization; defendant UBS Real Estate was the sponsor and seller; and defendant UBS Securities was the underwriter. The prospectus supplement for the MABS 2007–WMC1 Securitization included the following representations:

- *Underwriting Standards.* The mortgage loans have been either (i) originated *generally* in accordance with the underwriting guidelines established by [WMC Mortgage Corp.] (collectively, the "Underwriting Guidelines") or (ii) purchased by WMCMC or GE Money Bank after re-underwriting the mortgage loans *generally* in accordance with the Underwriting Guidelines.

- The Underwriting Guidelines are primarily intended to (a) determine that the borrower has the ability to repay

the mortgage loan in accordance with its terms and (b) determine that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults.

- Under the Underwriting Guidelines, WMC verifies the loan applicant's eligible sources of income for all products, calculates the amount of income from eligible sources indicated on the loan application, reviews the credit and mortgage payment history of the applicant and calculates the Debt Ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines.

- Under the Underwriting Guidelines, various risk categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These risk categories establish the maximum permitted LTV, maximum loan amount and the allowed use of loan proceeds given the borrower's mortgage payment history, the borrower's consumer credit history, the borrower's liens/charge-offs/bankruptcy history, the borrower's Debt Ratio, the borrower's use of proceeds (purchase or refinance), the documentation type and other factors. In general, higher credit risk mortgage loans are graded in categories that require lower Debt Ratios and permit more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies.

- The Underwriting Guidelines permit mortgage loans with LTVs ... of up to 100% (which is subject to reduc-

tion depending upon credit-grade, loan amount and property type).

- The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and require, among other things, (1) an appraisal of the mortgaged property which conforms to Uniform Standards of Professional Appraisal Practice and (2) an audit of such appraisal by a WMC-approved appraiser or by WMC's in-house collateral auditors (who may be licensed appraisers) and such audit may in certain circumstances consist of a second appraisal, a field review, a desk review or an automated valuation model.

(emphasis added). The prospectus supplements for the other twenty-one securitizations contained similar representations. The MABS 2007–WMC1 Securitization did, however, contain the following clause:

On a case-by-case basis [the originator] may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category or other guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low debt-to-income ratio ("Debt Ratio"), good mortgage payment history, an abundance of cash reserves, excess disposable income, stable employment and time in residence at the applicant's current address. *It is expected that a substantial number of the mortgage loans to be included in the trust will represent such underwriting exceptions.*

(emphasis added). Similar cautionary language was included in the prospectus supplements for six of the other twenty-one securitizations.

FHFA alleges that the originators of the loans underlying the securitizations systematically disregarded these underwriting guidelines in order to increase production and profits derived from their mortgage lending businesses. Defendants counter that the SAC fails to state a plausible claim that the statements regarding the underwriting standards were false. They argue that plaintiff's claims impermissibly rely on a forensic analysis of too few loans and on statistics about loan performance years after registration. They also argue that plaintiff has ignored warnings in the offering materials that there were "exceptions" to the stated guidelines and, in some cases, that a "substantial number" of the underlying loans deviated from those guidelines.

■ The SAC has plausibly alleged that the offering materials contained false statements regarding originators' compliance with the underwriting standards. In support of this claim, the SAC relies primarily on the results of FHFA's forensic review of individual loan files, which found, for example, that out of 996 randomly selected loans included in the MABS 2007–WMC1 and MABS 2006–WMC2 securitizations, approximately 78% were not underwritten in accord with the applicable underwriting guidelines. The claim is further supported by: investigations by government and private agencies that revealed underwriting failures by originators that contributed loans to the securitizations at issue here, confidential witness accounts, and, ultimately, the surge in defaults on the underlying mortgages and collapse of the certificates' credit ratings. Taken together, these allegations are sufficient to render plausible FHFA's assertion that the mortgage originators serially deviated from their mortgage underwriting standards.

This conclusion is unaltered by statements in the offering materials that the standards were only "generally" followed. Such limiting language does not assist a Securities Act defendant faced with a plausible assertion that as few as 1/4 of the mortgages in a given loan pool conformed to the underwriting standards. Nor are plaintiff's claims defeated by the disclosure in seven of the prospectus supplements that a "substantial" number of the loans deviated from the underwriting standards. These prospectus supplements also represented that any deviations would be warranted based on "compensating factors." By plausibly alleging a widespread failure to conduct any underwriting, the plaintiff has adequately pleaded the falsity of this representation as well.

Finally, defendants cite Item 1111 of SEC Regulation AB, 17 C.F.R. § 229.1111(a)(3), for the proposition that they may be held liable only for failing to disclose deviations from the underwriting guidelines that were known to them. This is another meritless attempt by the defendants to alter the plaintiff's pleading burden by grafting a scienter requirement onto Securities Act claims.

Item 1111 of Regulation AB requires that issuers of asset-backed securities disclose "the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, *to the extent known, any changes in such criteria* and the extent to which such policies and criteria are or could be overridden." 17 C.F.R. § 229.1111(a)(3) (emphasis added). The regulation thus imposes on a Section 11 defendant the duty to disclose not only underwriting criteria for the assets that underlie the securities, but also, "to the extent" the issuer knows of them, any changes in those criteria and the extent to which those criteria "could be overridden." *Id.* Indeed, this duty imposed by

Item 1111 may have prompted the cautionary language recited above that was incorporated into the offering materials for seven of the securitizations.

Yet, plaintiff's claim with regard to loan-underwriting standards is not that defendants failed to report information about changes in the underwriting criteria of which the defendants were aware, but that they affirmatively misrepresented the standards that "generally" governed the underwriting of mortgages included in the supporting pools. Regulation AB's guidance with regard to what information *must be included* in the offering materials does nothing to call into question defendants' overriding obligation under the Securities Act to avoid false statements in their offering materials. *In re Lehman Bros. Secs. and Erisa Litig.*, 684 F.Supp.2d 485, 493–94 (S.D.N.Y.2010).

### D. Section 15 Control Person Liability

■ UBS Americas, UBS Real Estate, and the individual defendants also contend that the SAC fails to allege that they exercised sufficient authority over the primary defendants to establish "control person" liability under Section 15. As noted above, Section 15 extends liability under the Securities Act to "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under [Section 11] or [Section 12]." 15 U.S.C. § 77*o*. This Court has previously held that the act of signing a registration statement, as the individual defendants in this case are alleged to have done, is a manifestation of the signer's responsibility for the information contained in the document and, therefore, sufficient to establish "control person" status. *See In re World-Com, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 420 (S.D.N.Y.2003). With respect to the corporate defendants, the SAC alleges that UBS Real Estate was actively involved in coordinating the securitization process and determining the structure of each offering and that UBS Americas was not simply the corporate parent of UBS Securities and MASTR but, in practice, controlled their actions in issuing and selling RMBS certificates. These allegations are sufficient to avoid dismissal of plaintiff's Section 15 claims at this early stage of the litigation.

### E. MASTR is a Statutory Seller Under Section 12(a)(2).

■ Finally, defendants maintain that MASTR is not a proper defendant with respect to plaintiff's Section 12(a)(2) and equivalent state-law claims. While Section 11 is limited to certain offering participants by its express terms, liability under Section 12(a)(2) is governed by the "statutory seller" requirement.

> An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant—if he: (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner.

*In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d at 359 (citation omitted).

Defendants contend that the SAC does not allege that MASTR is a "statutory seller" or include facts that would support such a finding. As plaintiff notes, however, SEC Rule 159A, provides that "in a primary offering of securities," an issuer is a statutory seller for the purposes of Section 12(a)(2) "regardless of the underwriting method used to sell the issuer's securities." *See* 17 C.F.R. 230.159A; *accord Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F.Supp.2d 506, 512 (S.D.N.Y. 2010). Moreover, the Securities Act provides that "with respect to certificates of

interest or shares in an unincorporated investment trust not having a board of directors ... the term 'issuer' means the person or persons performing the acts and assuming the duties of *depositor.*" ·15 U.S.C. 77b(a)(4). As noted, the securitizations at issue here were structured as investments trusts, and, for sixteen of the twenty-two of them, MASTR acted as depositor. MASTR is therefore a proper defendant under Section 12(a)(2).

Defendants resist this analysis by asserting that the provision of the Securities Act equating an "issuer" with a "depositor" does not apply to RMBS. But this argument is contradicted by Securities Act Rule 191, which provides that "[t]he depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity." 17 CFR 230.191. To the extent defendants would argue that the Rule's reference to "asset-backed securities" does not encompass RMBS, they are foreclosed from doing so by their reliance elsewhere in their motion on Regulation AB, which likewise governs "asset-backed securities" and was adopted as part of the same rulemaking proceeding that resulted in Rule 191. *See Asset–Backed Securities,* SEC Release No. 8518, 84 S.E.C. Docket 1624, 2004 WL 2964659, at \*9, \*2012 (Dec. 22, 2004).

## IV. FHFA's Negligent Misrepresentation Claims Fail.

 Although FHFA has adequately alleged violations of the securities laws, the Agency cannot sustain its negligent misrepresentation claims. Under New York law, a plaintiff asserting a claim for negligent misrepresentation must allege, *inter alia,* that "the defendant had a duty, as a result of a special relationship, to give correct information." *Hydro Investors,* *Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000) (citation omitted). In a commercial context, liability does not attach as a matter of course for merely negligent statements; rather, it is imposed "only on those who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 652 N.Y.S.2d 715, 675 N.E.2d 450, 454 (1996).

The Agency cannot credibly allege that a "special relationship" existed between the GSEs and the defendants, nor has it seriously attempted to do so. While it is true that "[w]hether the nature and caliber of the relationship between the parties is such that the injured party's reliance on a negligent misrepresentation is justified generally raises an issue of fact," *id.,* courts regularly hold as a matter of law that an arm's length business arrangement between sophisticated and experienced parties cannot give rise to a "special relationship." *See, e.g., Aerolineas Galapagos, S.A. v. Sundowner Alexandria, LLC,* 74 A.D.3d 652, 905 N.Y.S.2d 152, 152 (1st Dep't 2010); *Sebastian Holdings, Inc. v. Deutsche Bank AG,* 78 A.D.3d 446, 912 N.Y.S.2d 13, 15 (1st Dep't 2010); *Silvers v. State,* 68 A.D.3d 668, 893 N.Y.S.2d 12 (1st Dep't 2009).

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 87 A.D.3d 287, 928 N.Y.S.2d 229 (1st Dep't 2010), is particularly instructive here. MBIA, a provider of financial guarantee insurance, brought fraud and negligent misrepresentation claims against Countrywide, asserting that Countrywide entities had made material misrepresentations concerning the origination and quality of the mortgage loans that underlay mortgage-backed securities for which the plaintiff had written insurance policies. While permitting the fraud claim

to go forward, the New York State motion court dismissed the negligent misrepresentation claim as inadequately pled. The Appellate Division affirmed, noting that in light of the fact that "[t]he transactions in question were conducted by two sophisticated commercial entities" operating at arms length, "[t]he claim that Countrywide had superior knowledge of the particulars of its own business practices [was] insufficient to sustain the cause of action." *Id.* at 235–36.

■ So too here, FHFA cannot plausibly assert that the GSEs were so unequally situated vis-à-vis the defendants as to give rise to a claim for negligent misrepresentation. As defendants emphasize in their motion to dismiss, the GSEs were highly sophisticated players in the mortgage-backed securities market, which they participated in not only as purchasers but also as packagers and marketers of securities. As in *MBIA,* the fact that, with regard to the securities at issue in this case, the defendants had greater knowledge of the underlying loan files and the practices of third-party due diligence providers is not sufficient to establish a "special relationship."

The Agency seeks to avoid the "special relationship" requirement by arguing that its negligent misrepresentation claims are governed by the law of the District of Columbia, in the case of Fannie Mae, and Virginia, in the case of Freddie Mac. Unlike New York, these jurisdictions appear not to require that a plaintiff demonstrate a "special relationship" in order to sustain a negligent misrepresentation claim. Unfortunately for FHFA, however, its choice-of-law argument is meritless.

■ The Agency's common law claims are governed by New York choice-of-law principles pursuant to *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New

York has adopted the "interest analysis" approach to choice of law, which seeks "to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 672 F.3d 155, 158 (2d Cir. 2012) (citation omitted). In the context of tort law, interest analysis distinguishes between conduct-regulating rules, which dictate appropriate standards of conduct, and loss-allocating rules, which "prohibit, assign, or limit liability after the tort occurs." *Id.* (citation omitted). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *GlobalNet Fin. Com, Inc. v. Frank Crystal & Co., Inc.,* 449 F.3d 377, 384 (2d Cir.2006) (citation omitted).

The parties agree that the duty to avoid negligent misrepresentations is a conduct-regulating rule and that, consequently, the law of the jurisdiction where the tort occurred should govern FHFA's claims. They disagree only about whether the alleged misrepresentations "occurred" in New York, where the defendants are based, or in the District of Columbia and Virginia, where Fannie Mae and Freddie Mac, respectively, were injured. This dispute is easy to resolve. As should be clear from the discussion above, interest analysis understands the jurisdiction where the tort occurred to be that in which the defendant engaged in the behavior that the conduct-regulating rule seeks to deter. In this case, that jurisdiction is undisputedly New York, where the defendants prepared and disseminated the allegedly misleading offering materials that are at the center of this litigation. Because New York is the

jurisdiction with the most significant relationship to plaintiff's negligent misrepresentation claims and because, as noted above, plaintiff's pleadings are inadequate to state a claim under New York law, the negligent misrepresentation claims are dismissed.

## CONCLUSION

Defendants' January 20 motion to dismiss is denied as to FHFA's securities law claims and granted as to the negligent misrepresentation claims.

SO ORDERED.

## *OPINION & ORDER*

This is one of sixteen actions pending before this Court that have been brought by the Federal Housing Finance Agency ("FHFA" or "the Agency"), as conservator of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively, the "Government Sponsored Enterprises" or "GSEs"), against various financial institutions involved in the packaging, marketing and sale of residential mortgage-backed securities that the GSEs purchased in the period from 2005 to 2007.[1] An Opinion and Order of May 4 granted in part defendants' January 20 motion to dismiss the Second Amended Complaint. *See Federal Housing Finance Agency v. USB Americas, Inc.,* 858 F.Supp.2d 306, No. 11 Civ. 5201(DLC), 2012 WL 1570856 (S.D.N.Y. May 4, 2012) (the "May 4 Opinion").

This Opinion addresses the UBS defendants' May 23 motion to certify an interlocutory appeal from that portion of the May 4 Opinion that denied their motion to

dismiss as untimely FHFA's claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, *l* (a)(2), *o.* The Court ordered that the motion be briefed on an expedited schedule, and it became fully submitted on June 8, 2012.

In the interim, document discovery has begun in all sixteen cases. Pursuant to an Order of June 14, fact and expert discovery in this case must be complete no later than June 14, 2013. Any summary judgment motion must be fully submitted by August 30, 2013. Trial is scheduled to begin at 9:30 a.m. on January 13, 2014. At a scheduling conference on June 13, 2012, the defendants agreed that, if this Court granted their motion for certification, they would seek expedited review in the Court of Appeals.

Defendants seek interlocutory review of two specific conclusions in the Court's May 4 Opinion: (1) that the Housing and Economic Recovery Act of 2008 ("HERA") prescribes comprehensive time limitations for any claim the FHFA may bring as conservator for the GSEs, including a claim to which a statute of repose generally attaches; and (2) that HERA's timeliness provision applies equally to federal and state causes of action. For the purposes of certification, these conclusions are closely intertwined. If interlocutory review is granted, the Court of Appeals will address the specific question of whether the May 4 Opinion correctly analyzed HERA's impact on plaintiff's Securities Act claims. HERA's applicability to federal claims will necessarily be entailed in that analysis. Thus, while defendants' motion for certification raises two distinct legal issues, they reduce to a single question for appeal: whether the May 4 Opin-

---

1. The FHFA has also brought two similar actions, which are pending in federal courts in California and Connecticut. *See FHFA v. Countrywide Financial Corp., et al.,* No. 12 Civ. 1059(MRP) (C.D.Cal.); *FHFA v. Royal Bank of Scotland,* No. 11 Civ. 1383(AWT) (D.Conn).

ion erred in concluding that HERA displaces the statute of repose that generally governs claims under the Securities Act. The Court therefore addresses its analysis of the Section 1292(b) factors to that single question, recognizing that "it is the *order* that is appealable, and not the controlling question identified by the district court" or the parties. *California Public Employees' Retirement System v. Worldcom, Inc.*, 368 F.3d 86, 95 (2d Cir.2004) (citation omitted).

Having considered those factors, the Court concludes, for the reasons that follow, that defendants have carried their burden of demonstrating that an interlocutory appeal should be certified. The motion is therefore granted on the condition that defendants seek expedited review in the Court of Appeals.

## DISCUSSION

The standard for certification is well established. Section 1292(b) provides, in relevant part, that

> [w]hen a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a *controlling question of law* as to which there is *substantial ground for difference of opinion* and that an immediate appeal from the order *may materially advance the ultimate termination of the litigation,* he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

28 U.S.C. § 1292(b) (emphasis supplied); *see Casey v. Long Island R. Co.*, 406 F.3d 142, 146 (2d Cir.2005) (noting that Section 1292(b) "imposes both procedural and sub-

stantive requirements on a would-be appellant").

 The Court of Appeals has emphasized that Section 1292(b) certification should be "strictly limited because only exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Flor v. BOT Fin. Corp.*, 79 F.3d 281, 284 (2d Cir.1996) (citation omitted). Certification is thus appropriate only in the narrow class of cases in which "an intermediate appeal may avoid protracted litigation." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 866 (2d Cir. 1996). In considering whether to enact Section 1292(b), the House Committee on the Judiciary specifically identified as falling into that category cases such as this one, in which "a long trial is envisioned to determine liability over a defense disputing the right to maintain the action." *Id.*

### 1. Controlling Question of Law

 The Second Circuit has recognized that "resolution of an issue need not necessarily terminate an action in order to be 'controlling,' " for the purposes of Section 1292(b). *Klinghoffer v. S.N.C. Achille Lauro, et al.*, 921 F.2d 21, 24 (2d Cir.1990). Rather, it is enough to satisfy the statute's first prong that the issue is one "that may importantly affect the conduct of [the] action." *In re The Duplan Corp.*, 591 F.2d 139, 148 n. 11 (2d Cir.1978); *accord In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288(DLC), 2003 WL 22953644, at *4 (S.D.N.Y. Dec. 16, 2003). Moreover, timeliness determinations, which go directly to the plaintiff's ability to maintain some or all of its claims, are precisely the type of legal issue that Congress intended to be addressed through the Section 1292(b) procedure.

In resisting certification, plaintiff insists that, even if the Court of Appeals were to

conclude that HERA does not abrogate the statute of repose generally applicable to claims under the Securities Act, some portion of its claims would be preserved by contractual tolling agreements with various defendants or the class-action tolling doctrine enunciated in *American Pipe & Construction v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Plaintiff also suggests that its state-law Blue Sky claims would be unaffected by an interlocutory ruling, because, under the doctrine articulated in *United States v. Summerlin,* "the United States is not bound by state statutes of limitations." 310 U.S. 414, 416, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940). Needless to say, defendants take issue with these contentions. The May 4 Opinion did not address them in light of the Court's conclusion that plaintiff's claims were timely under HERA.

Whether or not plaintiff is correct that an interlocutory ruling on the issues raised by the defendants could not terminate the litigation, there can be no question that such a ruling would "importantly affect the conduct of [the] action." *In re The Duplan Corp.,* 591 F.2d at 148 n. 11. As defendants note, plaintiff's tolling arguments do not apply to 14 of the 22 Certificates at issue here. Thus, even if those arguments have merit, an appellate ruling that HERA's timeliness provision does not abrogate statutes of repose would significantly narrow the scope of discovery in this case and the proof that the parties would be able to present at trial, saving the parties and the public time and money. And given that defendants challenge the plaintiff's *Summerlin* argument in part on the ground that the Supreme Court's holding does not apply to state statutes of repose (as distinct from statutes of limitations), an appellate decision addressed to the relationship between those two concepts would bear significantly on the Court's decision as to whether to allow the

Blue Sky claims to go forward in the event the federal claims were dismissed. The issues upon which the defendants seek interlocutory review thus constitute "controlling questions of law" within the meaning of the statute.

### 2. Material Advancement

For many of the same reasons, appellate resolution of the issues identified by the defendants would "materially advance the ultimate termination of the litigation." As discussed, a conclusion by the Court of Appeals that this Court erred in its May 4 ruling has the potential to end or at a minimum significantly restrict the scope of this litigation. But the efficiencies to be gained by interlocutory review are not lost if the Court of Appeals ultimately affirms this Court's May 4 ruling. An appellate ruling that FHFA's claims are in fact timely is likely to significantly affect the parties' bargaining positions and may hasten the termination of this litigation through settlement.

Appellate resolution of the timeliness of plaintiff's Securities Act claims will also remove a cloud of legal uncertainty that hangs over the other 17 actions in this suite of cases. This, in turn, will facilitate and streamline motion practice in those other cases and may affect the parties' strategic decision-making going forward. Courts may properly consider such "system-wide costs and benefits" in determining whether to permit interlocutory review. *Klinghoffer,* 921 F.2d at 24. Indeed, several district courts, including this one, have opined that certification may be particularly appropriate in complex litigation involving multiple coordinated actions. In such cases, interlocutory review may be the best way to "materially advance the ultimate termination of the litigation by avoiding 'protracted litigation and multiple appeals' "

of the same or similar issues. *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22953644, at \*8 (quoting *In re Air Crash Off Long Island, New York on July 17, 1996*, 27 F.Supp.2d 431, 434 (S.D.N.Y. 1998)).

### 3. Substantial Grounds for a Difference of Opinion

■ The remaining prong of Section 1292(b), which requires a finding that the issue to be certified is one about which there are "substantial grounds for a difference of opinion," poses the greatest challenge for the defendants. It is well established that an issue of "first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Flor v. BOT Fin. Corp.*, 79 F.3d 281, 284 (2d Cir.1996). And, for reasons explained at length in the May 4 Opinion, the Court has little doubt that its interpretation of HERA is the one that best comports with the "everyday" meaning of the statutory text and "the objectives of the statute overall," 858 F.Supp.2d at 317, 2012 WL 1570856, at \*5.

In urging certification, defendants suggest that the Opinion's reference to the "semantic distinction between 'statutes of limitations' and 'statutes of repose,' " 858 F.Supp.2d at 314–15, 2012 WL 1570856, at \*4, is inconsistent with Second Circuit precedent emphasizing that the two concepts are substantively distinct. That argument is disingenuous. The Court's use of the term "semantic" was plainly intended in the literal sense, to refer to a distinction "relating to meaning in language." *See Merriam–Webster's Collegiate Dictionary* 1129 (2003). At no point was it suggested that the terms are synonymous. To the contrary, the Court was careful to observe the conceptual distinctions between them in arriving at its conclusion that HERA's reference to "statutes of limi-

tations" embraces both the narrow sense of that term intended by the defendants as well as what defendants refer to as "statutes of repose." *See* 858 F.Supp.2d at 317, 2012 WL 1570856, at \*5.

Nor does the fact that, twenty years ago, Congress passed a single statute tolling "any ... period of limitation or repose," *see* Pub.L. No. 102–339, § 3(b), 106 Stat. 869 (Aug. 11, 1992), and has since considered (without enacting) bills that use the term "statute of repose," suggest substantial grounds for a difference of opinion with respect to the meaning of *this* statute. As discussed in the May 4 Opinion, Congress, the courts and learned commentators regularly use the term "limitations" to encompass both "statutes of limitations," in the sense intended by the defendants, and "statutes of repose." 858 F.Supp.2d at 314, 2012 WL 1570856, at \*4. Indeed, in 2002 Congress modified the repose period applicable to claims under the Securities Exchange Act of 1934 in a provision entitled *"Statute of limitations* for securities fraud." *See* Sarbanes–Oxley Act, Pub.L. No. 107–204, § 804, 116 Stat. 745, 801 (2002) (codified at 28 U.S.C. § 1658(b)) (emphasis added).

As the Supreme Court again reminded us only recently, when confronted with a textual ambiguity of this kind, the task of the Court is to give the statutory terms their ordinary meaning unless the context clearly suggests that an atypical usage is intended. *Taniguchi v. Kan Pacific Saipan, Ltd.*, —— U.S. ——, 132 S.Ct. 1997, 2002, 2004, 182 L.Ed.2d 903 (2012). In ordinary usage, the term "statute of limitations" refers generally to "a statute assigning a certain time after which rights cannot be enforced by legal action or offenses cannot be punished." *Merriam–Webster's Collegiate Dictionary* 1220 (2003). Nothing in HERA suggests that, in prescribing "the applicable statute of limitations with

regard to any action brought by the [FHFA]," 12 U.S.C. § 4617(b)(12), Congress sought to depart from this ordinary meaning in favor of the more technical definition proffered by the defendants. To the contrary, the statutory context indicates powerfully that the opposite is true. As emphasized in the May 4 Opinion, "[r]eading HERA's reference to 'statute of limitations' in the narrow fashion that defendants propose would undermine the congressional purpose of a statute whose overriding objective was to maximize the ability of FHFA to 'put the [GSEs] in a sound and solvent condition.'" 858 F.Supp.2d at 316, 2012 WL 1570856, at *5 (quoting 12 U.S.C. § 4617(b)(2)(D)).

In seeking certification, defendants do not challenge this characterization of HERA's purpose. Rather, to establish that there is a substantial ground for difference of opinion as to HERA's meaning, they rely on two brief district court decisions interpreting entirely different statutes, albeit statutes whose text is nearly identical to that of HERA's extender provision. *See Nat'l Credit Union Admin. Board v. RBS Secs., Inc.*, No. CV 11–5887–GW (C.D.Cal. Jan 30, 2012); *Resolution Trust Corp. v. Olson*, 768 F.Supp. 283 (D.Ariz.1991). It goes without saying that these decisions, which concern the Federal Credit Union Act, 12 U.S.C. § 1787(b)(14)(B)(i), and the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), 12 U.S.C. § 1821(d)(14), do not bear directly on the issue before the Court: the proper interpretation that is to be given to HERA, a different statute, enacted under different circumstances, and addressed to a different class of problems. While the Credit Union Act and FIRREA, like HERA, indicate a Congressional intent to "preserve and conserve" the assets of insolvent financial institutions, there are reasons to think that Congress was willing to go further to en-

sure the solvency of the two GSEs than to ensure the survival of any one of the thousands of banks and credit unions around the country. *See* May 4 Opinion, 858 F.Supp.2d at 317 n. 8, 2012 WL 1570856, at *5 n. 8 (noting that "HERA creates an exception" to the Securities Act's typical time limitations for "a single, privileged plaintiff—FHFA"). Indeed, given that in 2008 the GSEs financed about 40% of all American mortgages and owed debt in excess of $5.3 trillion, their failure would have been catastrophic for the American economy in a way that, with few exceptions, the failure of a single bank or credit union would not be. *See* Carol D. Leonnig, *How HUD Mortgage Policy Fed the Crisis*, Washington Post, June 10, 2008, at A01.

Yet the two decisions cited by the defendants do not reach these issues of statutory purpose. Rather, with little explanation, they conclude that the terms "statute of limitations" and "statute of repose" are mutually exclusive, and unambiguously so. For reasons that have been outlined at length here and in the May 4 Opinion, the Court finds this position untenable in light of the commonly understood meaning of "statute of limitations" and the frequent practice by Congress, federal courts and commentators of using the term to encompass all forms of time limitation. Nonetheless, it must be acknowledged that the existence of these two decisions suggests that there may be grounds, however weak, for a difference of opinion on this question.

In light of the compelling arguments for certification on the other two prongs of the Section 1292(b) analysis, the tension between the May 4 Opinion and the two decisions cited by the defendants is sufficient to justify certification. But because the Court's decision to certify is driven primarily by the prospect that an immediate appeal may expedite the conclusion of

this litigation—whether through judicial resolution or settlement—the certification is contingent on the defendants' seeking expedited review in the Court of Appeals, a condition to which they agreed at the June 13 conference.

## CONCLUSION

Defendants' May 23 motion for certification of an interlocutory appeal of the May 4 Opinion is granted.

SO ORDERED.